[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 198 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 199 
On December 31, 1981, around two o'clock in the afternoon Mississippi Highway Safety Patrolman Billy M. Langham, while acting in line of duty, was murdered on U.S. Highway 49 in Covington County, at the city limits of Collins. He was stabbed with a butcher knife in the back between his shoulder blades, and shot at close range with his own revolver.
Samuel Bice Johnson, one of three men indicted for his murder, following a change of venue, was tried in the Circuit Court of Pike County for capital murder, sentenced to death, and has appealed. Two other men charged in the murder, Otis Lee Fairley and Charles Montgomery, Jr., following separate trials, have been convicted of capital murder, and each sentenced to life imprisonment.
We affirm.
There is no dispute but that Langham was murdered, but it was Johnson's contention at trial and on this appeal that the murderer was Anthony Fields, who constituted the fourth culprit there at the scene of trouble with Patrolman Langham. Johnson has raised numerous issues on his appeal, which we will address. First, the facts.
 FACTS
Anthony Fields and Otis Lee Fairley are first cousins. On December 31, 1981, they were staying together in New Orleans. Around 10:00 that morning the two of them were picked up by Samuel Bice Johnson and Charles Montgomery, Jr., in a 1971 Ford LTD with a yellow body and brown top, Johnson driving.
Fields had seen, but never met Johnson or Montgomery prior to that morning. Montgomery rode on the front seat with Johnson with Fields on the left and Fairley on the right side of the back seat. Their destination was Collins. Fairley was born in Collins and lived there until 1968. Fields was born in Gulfport, where he lived for 15 *Page 200 
years and then moved to New Orleans. The precise purpose of their trip to Collins is not shown in the record. Fields's mother lived in Collins, having moved there three years previously; Fairley had two sisters living there; and they both had numerous kinsmen there. Fields never lived in Collins.
En route they stopped in either Lumberton or Purvis where Fairley had a sister.
They were traveling North on Highway 49, presently four lanes with a strip between the North and South bound lanes. There are several low hills as the highway approaches Collins from the South.
At approximately 1:30 that afternoon, as they were approaching Collins, they passed Highway Patrolman Billy M. Langham, parked in a Dodge patrol car, with a blue light on top and Highway Safety Patrol decals on its sides. Langham was in uniform, wearing his badge, and armed with a .357 caliber magnum Smith and Wesson revolver.
As they passed the patrol car, Langham started after the Ford with his blue lights blinking. Johnson pulled his car over on the right shoulder and Langham parked the patrol car just a few feet to the rear. Langham walked to the driver's side of Johnson's car and asked to see Johnson's license. Johnson replied he had no license and Langham told him to get out of the car.
The state's version of what then transpired came primarily from Fields, who testified that after Johnson got out of the car Langham noticed a butcher knife on the front seat. Langham picked the knife up, put it on top of the patrol car next to the blue light, and told Johnson to go to the back of his car.
Langham then came back to the Ford car and told the other three he was going to have to search them. They also got out of the car, Langham patted all of them lightly and told them to stand by his car. Fields noticed Johnson whispering to Fairley.
Langham then went to the Ford and searched the front seat. The officer then started the search of the back seat. As he was in the process of searching the back seat, Fairley got the knife off the top of the patrol car and gave it to Johnson. Then, as the officer straightened up from searching the back seat, Johnson stabbed him in the back.
When Fields was asked on direct examination why Johnson would stab the officer, he replied it was to escape.
Fields further testified that when Johnson stabbed Langham, the officer reached for his revolver. He said Johnson then changed hands and went for the revolver, also, and the two started tussling, and Johnson kept on stabbing the officer. Johnson yelled to Fairley to "come knock him out," and after several calls Fairley suddenly ran over and started hitting Langham in the face. Johnson then yelled for Montgomery to get the officer's gun. Montgomery, who was then standing close by the scuffle, hesitated, and then suddenly reached and grabbed the gun. Montgomery then said, "I got it."
The scuffle began by the Ford and moved back towards the patrol car. The officer looked to Fields and said, "Help." Fields did nothing.
When Montgomery got the pistol, Johnson and Fairley both ran for the car. Montgomery remained standing there with the gun on the officer. Langham asked Montgomery, "Please don't shoot me." He asked this more than once.
Montgomery was holding the gun with both hands. He took one hand off to open the car door, and Johnson, who was under the steering wheel, told Montgomery, "No, shoot the m____ f____." Montgomery hesitated, and Johnson repeated the statement.
Montgomery then put both hands on the pistol and started walking towards the officer. Fields, by this time in the back seat of the LTD, dropped his head so as not to see, and heard a shot. He then heard Montgomery say, "I got him," and Montgomery got into the car. As Johnson drove off Montgomery threw the gun out the window. The record does not reveal from *Page 201 
Fields testimony when he got back into the car.
Johnson cursed Montgomery for throwing the gun away, slowed the car down, but because there were witnesses approaching from behind, he did not stop.
As they were driving Johnson repeatedly said he had to find another car. He parked the Ford, and they all got out and ran for a railroad track. When they got on the track, they started walking towards town. Johnson removed the sweater he was wearing and threw it beside the track, which Fields described as brown. Johnson had no clothing under the sweater. Fairley removed his sweat suit to give Johnson his t-shirt, which Johnson put on.
They spotted a yellow Mercury Comet beside the track next to a building. Johnson inspected the car, found the keys were in it, and the four of them got into the car, Johnson driving.
Fairley got on the front seat with Johnson, and Montgomery and Fields got in the back. Johnson told Montgomery and Fields to lie down, which they did.
As they were traveling in the Comet, Johnson asked the others if they thought he did the wrong thing. Montgomery and Fairley said he did the right thing, and Johnson said he'd rather be dead than go back to jail.
The Comet ran a road block at the intersections of Highways 35 and 84 in Jeff Davis County. The officers on the scene shot the tires, and the Comet stopped. Fairley and Johnson ran from the car.
Fields got out with his hands up, and was arrested. Montgomery remained in the car and was arrested.
The officers pursued Johnson and Fairley on foot, and in a short distance caught and arrested them both.
Fields pleaded guilty to the crime of accessory after the fact and was sentenced to five years. He also received three 10-year sentences for guilty pleas to other crimes, two to run concurrent, one consecutively: a total of 25 years to serve. He testified as a witness for the State. He had no prior felony convictions. He had previously been charged with possession of a deadly weapon, assault, and possession of stolen property, and convicted of a misdemeanor, for which he served some time in jail.
On cross-examination Fields admitted to drinking on the way to Collins. The others smoked some marijuana. He said he stood by the front left tire of the patrol car while the scuffling was going on, and never touched Langham. He also testified that when he was questioned by an officer if Johnson did not pull the knife from his pocket he had answered "yes." He admitted he had forgotten to tell the officers about Johnson removing the sweater until some time later, and when he did recall the incident he told his lawyer.
He said the first time he saw the butcher knife was when the officer put it on top of the patrol car. Until then he was unaware Johnson had a knife. He also admitted telling the officers Johnson had a coat on, but said Johnson had the coat on after Montgomery gave it to him.
For purposes of clarity in this opinion, we have given the testimony of Fields first, although he was the last person who testified in the case in chief for the State. We relate the remainder of the facts as told by the State's witnesses.
Andy Wade, a 12- or 13-year-old boy, was riding North on the highway and noticed passing a patrol car parked behind a yellow car, and a patrolman apparently searching the back seat area of the yellow car.
Andy Cochran and his niece, Mrs. Brenda Townsend Watson, wife of a highway patrolman, were two of the occupants of a car traveling South on the highway. They noticed the blue lights on the patrol car, slowed down, and observed the yellow Ford parked in front of the patrol car. They also observed three black men tussling with the patrolman. They saw the officer break away, and being grabbed by the three men. They observed the officer's arm being held behind his back, and blood between his shoulders running down his shirt. Three men were involved in the *Page 202 
tussling. Mrs. Watson saw the officer being pushed down the embankment. They proceeded South to a place where they could cross over into the North-bound lane of the highway, observing the affray as best they could. By the time they had turned around and got back to the scene, the yellow Ford had driven off. Cochran identified the yellow car as a Ford LTD. Cochran briefly examined the slain officer, and took off after the yellow Ford. They saw a deputy sheriff and reported what had transpired. Neither Cochran nor Mrs. Watson was able to identify any of the individuals involved in the trouble. Mrs. Watson testified she did not see any person making an attempt to help the officer, or any person merely standing around, doing nothing.
Charles Dodds was driving North on the highway. As he approached the scene, he noticed at least three men pushing and shoving the patrolman between the cars and the right-hand ditch. At very first glance they appeared playful. He noticed one man with his arms around the patrolman. Dodds parked his car 60-75 yards from the scene. He noticed the patrolman either being pushed, or breaking away towards the ditch. He could not tell whether the scuffle was beside or in front of the patrol car. He noticed the patrolman taking about two steps towards the ditch as though trying to regain his balance. Either his back or side was to the men, and just as he finished his second step, another man, standing to the left of the man holding the officer, shot him.
Dodds reached and got his own gun and loaded it. By the time he raised up all but one of the men had got into the yellow car. He saw the last man getting in on the right hand side.
On cross-examination Dodds testified that at one time it appeared the men were almost in a straight row. He noticed one of the men was huskier than the others, and he observed this man holding the officer. Johnson was not husky. Dodds did not observe any of the blacks standing around doing nothing.
Charles Hollingsworth, a first lieutenant in the Army, a graduate in criminal justice from Mississippi Southern University, and a former police officer in Hattiesburg, was traveling North on the highway when he first observed at least two people at the right rear of the Ford fighting with the patrolman. It seemed to him one person was holding the patrolman and two more were hitting him.
He stopped his car some thirty to thirty-five feet from the Ford and continued to watch. He was about to get out of his car when he heard a shot. There was no fighting going on when he heard the shot. Be saw no weapon. Just before the shot was fired, it appeared the patrolman had been pushed back five or ten feet from the others. When Hollingsworth heard the shot, he dropped to his car floorboard.
When he raised up he observed men getting into the Ford. He could only identify Anthony Fields. His testimony as to what he observed Fields doing is ambiguous. On cross-examination he testified as follows:
 Q. Coming down 49 you saw what appeared to you to be a scuffle, is that right?
 A. There was a fight going on, yes, sir, it was.
 Q. And you have said previously that there were at least two people involved, is that right?
 A. That is correct.
 Q. You also said that there could have been more people involved, is that right?
 A. That is correct.
 Q. Did you see those people?
 A. I saw at least two people.
 Q. Did you see more than two people?
 A. There could have been more than two people.
 Q. Did you see any more people?
 A. I at least saw two in the view that I had from my car.
 Q. Didn't see anyone else other than those two, is that right? *Page 203 
 A. They were the two I saw initially, that's correct.
 * * * * * *
 Q. Did you tell Wade Parham in a telephone conversation that there could have been someone in the car?
 A. I could have possibly said that. I don't remember saying it.
 Q. But you're not denying it, is that correct?
 A. I'd have to look at my testimony on my original statement.
 Q. I hand you a copy of your transcript of the telephone conversation. I'd like to call your attention to — Mr. Parham asked you the question: "Did you see more than two blacks, Mr. Hollingsworth? And you said, "There were probably more than two but, you know, I only noticed two. There could have been more out of the car and there could have been one guy that was still driving? Did you say that?
 A. It's in the statement. I guess I did say it.
 Q. Thank you, sir. When you first saw those people if there was a scuffle, the scuffle had already — if there was a stabbing that stabbing would have already taken place, is that right?
 A. I cannot answer that.
 Q. Did you see anyone stab the Highway Patrolman?
 A. No, I did not.
 Q. Did you notice whether the Highway Patrolman was hurt?
 A. At what point in time?
 Q. When you first saw him?
 A. When I originally saw him I could not tell.
 Q. Did you see anyone stab the Highway Patrolman?
 A. No, I did not.
 Q. Did you see anyone shoot the Highway Patrolman?
 A. No, I did not.
 Q. But you heard the shot, didn't you?
 A. Yes, I did.
 Q. Okay. Backing up just a short piece in time, when you stopped after you saw the scuffle you saw only two people, correct?
 A. That's what I had in my statement, yes.
 Q. Had there been more people out there they could have already gotten back in the car, is that correct?
 A. That is a possibility.
 Q. Okay. And you were able to identify one of those two people, weren't you?
 A. Yes, I did.
 Q. Tell the people of the Jury who that man was?
 A. I do not recall what his name was.
 Q. Was it Anthony Fields?
 A. I believe it was.
 Q. Are you not certain?
 A. I know I identified him; I don't remember what his name was.
 Q. Would you like me to help you with your statement? It was Anthony Fields, wasn't it, and you identified him?
 A. Yes, it was.
 Q. He's the man that turned State's evidence, is that correct?
 A. I believe so.
 Q. You said he was a big one, he was husky, correct?
 A. I believe I said that, yes.
 Q. And you saw two people and then you heard the shot, is that right?
 A. That's correct.
 Q. Was Mr. Fields trying to help that police officer?
 A. I don't know.
 Q. He was fighting with that police officer, wasn't he?
 A. He was one of the men I identified. I could not tell.
 Q. You told the District Attorney's office that they were fighting with that police officer, didn't you?
 A. Yes, I did.
 Q. You did? So he was fighting with him, wasn't he?
 A. I don't know if Mr. Fields was fighting with him, but I know — *Page 204 
 Q. [INTERRUPTING] What about the two men you saw, were they fighting or just —
 BY MR. EVANS:
 If the Court please, I request that he be allowed to finish his answer before he asks another question.
 BY THE COURT:
 Yes. Let him finish his answer and then you may ask another question.
 BY MR. DIAZ:
 I beg the Court's indulgence.
 A. Would you repeat the question, please?
 Q. In your previous statement you said that you saw two black men, is that right?
 A. That's correct.
 Q. And you told in your statement that those two men were fighting with the Highway Patrolman? Is that correct?
 A. That's correct.
 Q. And you identified one of those two men as Anthony Fields, didn't you?
 A. I identified one of the men that I could recognize as Anthony Fields, that's correct.
 Q. He was one of the men fighting with the Highway Patrolman, wasn't he?
 A. He could have been, yes.
 Q. Okay. The man sitting right over there in the green suit, is he the other man?
 A. I don't know.
 Q. Take a good look at him.
 A. I said I don't know. This all happened in a matter of some ten or fifteen seconds.
 Q. Okay. To be certain that there's no confusion, this is not the man you identified, is it?
 A. No, it is not.
 Q. The man you identified was heavyset and known to be Anthony Fields, correct?
 A. That is correct.
 [Vol. VIII, pp. 1319-1324]
Bennie Sasser was the final disinterested eyewitness for the State. He was a resident of Covington County, and traveling North on the highway. As he approached the parked vehicles, he noticed something unusual. He observed the patrolman jerk his arm up suddenly and that he was being hit in the back. He then testified [Vol. VIII, pp. 1326-27]:
 There were three, possibly four black men standing out there, and one black man was shorter and heavier-set that was doing the hitting in the back of the Patrolman. Then I observed the Patrolman got away from them, was pushed or something and he ran down the embankment, and about this time I was having to dodge a pickup that was in front of me, and I looked back and he was running back toward them. And as I swerved back around then I noticed that they were getting in their car, the car doors were open, and that's the last time I saw them. . . .
On cross-examination he testified that the husky man he observed hitting the officer in the back was not Johnson. He said it was possible that the man hitting the officer in the back could have been stabbing him.
The postmortem by Thomas Glen Puckett, Hattiesburg pathologist, revealed three wounds: a cut to the bone over the left eye and cheekbone; a 2-2 1/2 inch long, 7-8 inch deep stab wound in the back below the shoulder blades extending into the lung cavity; and a stellate entrance gunshot wound about the level of the left eyebrow. This type of wound was indicative of a weapon being fired at such close range that the gases from the discharging weapon also entered the victim. Langham's right eye was bulged out markedly as a result of gas from the weapon. The bullet traveled through the brain and lodged between the right rear exterior of the brain and skull.
The doctor testified that Langham was killed by the gunshot wound. He further testified that the stab wound, while serious, might not have been fatal, particularly if Langham could have received reasonably prompt medical attention; but on the other *Page 205 
hand could have resulted in death within ten minutes.
Ballistics tests revealed the bullet removed from Langham's skull was fired by his own .357 caliber magnum revolver. This revolver and the butcher knife were found at the scene of the slaying. No fingerprints were recovered from either weapon. also, tests for powder residue from a discharged firearm were negative as to all four: Johnson, Montgomery, Fairley and Fields.
Following their arrest Johnson was observed as having a bad cut on his right palm, for which he received medical treatment.
Tests showed the bloodstains on the knife were Langham's. Also, bloodstains on various parts of the exterior of the yellow Ford were determined to be Langham's. Other stains were found to be blood, but the expert was unable to identify the precise type.
The sweater, which Fields called brown, and identified by all witnesses at trial as being white, was found by Lawrence Anderson, assistant chief of police of Collins, just off the railroad tracks in the area where Fields testified it had been thrown. Tests showed the bloodstains on the body of the sweater came from Langham, and bloodstains on the sleeve came from Johnson.
On clothing identified as belonging to Montgomery tests showed bloodstains of Langham.
No bloodstains were found on Fields's clothing.
Bloodstains were found on Fairley's clothing but not identified.
All the bloodstains on Johnson's clothing were of his own type.
Joe E. Andrews, Jr., an expert on hair and fiber identification employed by the Mississippi Crime Lab, testified there are three basic fibers: animal, plant and synthetic. From his examination of Johnson's clothing, he found gold synthetic fibers with the same characteristics as found on the sweater. Also, from an examination of Montgomery's clothing, he found gold synthetic fibers with the same characteristics as on the sweater. It is not clear from the record whether these fibers found on the sweater and Johnson's and Montgomery's clothing were part of the fabric of the sweater, or simply fibers that had become attached to the sweater. On cross-examination Andrews conceded it was possible that all three of these gold synthetic fibers could have come from some common source other than the sweater.
No such fibers were found on either Fairley's or Field's clothing, nor on Langham's clothing.
Johnson did not testify. The only eyewitness testifying in Johnson's behalf was Fairley, who gave an entirely different version of the affray.
Fairley testified that after Johnson stopped the car, Langham came over to the driver's side of the car and asked Johnson if he had a driver's license, and when Johnson replied "no," the officer told him to step to the back. He said the officer then came around to the passenger's side and asked Montgomery to get out, and step to the back of the car, following which the officer began searching the front passenger seat. After searching the front of the car, the officer told Fairley and Fields to get out of the car. He testified the officer did not find a butcher knife on the front seat of the car, and did not put a knife on top of the patrol car.
He said the officer told them to "stand to the back." (Vol. XI, p. 1889) Further, he stood at the front end of the patrol car, and the other three were there standing along the side, by the front of the patrol car.
Fairley said the officer had begun to search the back seat of the car and Fields walked up and stabbed him, and that the first time he ever saw the knife or had any knowledge of it was when Fields stabbed the officer.
Fairley said Johnson then ran up and grabbed for Fields, he guessed, and got cut, and that he then ran to the car. He testified that Johnson screamed and cursed *Page 206 
that he had got cut. Fairley said Montgomery came to the car next, and seconds later after Johnson got cut, he came to the car, also. He said Johnson tried to crank the car up and it wouldn't get started at first, but finally started, and then they heard a shot and Fields came to the car. Fairley said Fields had a white sweater on.
He did not know whether Johnson got the knife away from Fields or not, but the struggle lasted only seconds.
On direct examination Fairley testified he had been convicted of murder two times (apparently the last time was a conviction for Langham's murder), and twice for assaults, one with, and the other without malice.
On state cross-examination Fairley was asked the purpose of the trip to Collins, and the trial judge sustained the objection to this question.
Further, on cross-examination he testified when the officer was stabbed "we ran up to help the officer and that's when the struggle started. I ran to the car." He said his intention was to grab Fields and when Johnson screamed he ran to the car. He did not relate Montgomery as participating in the affray in any way, but when he ran back to the car Montgomery was there, also.
He said Fields held the officer, stabbed him and scared off the other three all by himself. And, Fields got in the car by the time Johnson got it started.
Further, on cross-examination Fairley said Fields gave Johnson directions to drive the yellow Ford, and they ended up down by the co-op and railroad track. He then testified Fields ran into the yellow Comet, and at this time Johnson and Montgomery were down the street. Fields got in the Comet and Fairley got in and they drove off to Johnson and Montgomery, who then got in. Fields drove just a short distance and said he was too nervous to drive, and asked Johnson to drive. He testified Johnson, with his hand bleeding, got out of the back seat and got in the front seat and started driving.
As to the white sweater which Fairley testified Fields was wearing, he said while they were on the tracks he asked Johnson and Montgomery to help him pull the sweater off. He could not remember how they pulled it off.
He said the reason the three of them did not grab Fields and overpower him was they were afraid, or had panicked.
He admitted that he had told his sister Rosa McCullen that Johnson stabbed the officer and Montgomery had shot him.
Dr. William Munn testified to treating two lacerations at the base of the thumb and little finger of Johnson's right hand, which had almost stopped bleeding at the time he was treating Johnson. Neither wound involved muscles or tendons. The doctor recalled stitches were put in one or the other of the wounds.
There were four jail house witnesses, two who testified for the defense, and two in rebuttal for the state. James Jenkins and Carl Lee testified that while they were in the Simpson County Jail they heard Fields admit to Fairley he had lied to save himself from going to the gas chamber.
Norman Shelly in rebuttal testified he heard Fairley and Johnson talk about Fairley taking the knife and Johnson stabbing the patrolman. Danny Russell in rebuttal testified Johnson asked him to say that Fields had lied and tricked the state.
 PART A. LAW GUILT/INNOCENCE PHASE I. WEIGHT OF THE EVIDENCE
Johnson's first contention is that the verdict of the jury is against the overwhelming weight of the evidence. Fields testified Johnson stabbed Langham and told Montgomery to shoot, drove the get away car, and led the group. Only Fairley disputed this, and he admitted that he had told his sister Johnson stabbed the officer *Page 207 
and Montgomery shot him. The credibility of these witnesses was for the jury. Disinterested eyewitnesses, who saw varying brief time frames of the affray, were not able to specifically identify Johnson as doing anything to the officer during their respective moments of observation, and two recalled Fields under circumstances which would indicate he may very well have been more than an idle spectator, as he testified. There again, it was for the jury to accept the portions of Fields's and Fairley's testimony they wished to believe or discredit. This Court has long held, as stated in Cochran v. State, 278 So.2d 451 (Miss. 1973), citing Wilson v. State, 264 So.2d 828 (Miss. 1972):
 In a criminal prosecution, the jury may accept testimony of some witnesses and reject that of others, it may accept in part and reject in part the testimony of any witness, or it may believe part of the evidence on behalf of the State and part of that for the accused. In other words, the credibility of witnesses is not for the reviewing court. Bond v. State, 249 Miss. 352, 162 So.2d 510 (1964).
 It was the function of the jury to pass upon the credibility of the witnesses and to resolve the issues. Since there was ample evidence, which if believed by the jury, justified the verdict, the verdict will not be disturbed on appeal. Murphree v. State, 228 So.2d 599 (Miss. 1969). (264 So.2d at 830). [Other citations omitted]
See also: Dickerson v. State, 441 So.2d 536 (Miss. 1983) at 538, citing Gandy v. State, 438 So.2d 279, 285 (Miss. 1983);Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983); andGathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).
Significant is the testimony that both Johnson's and Langham's bloodstains were found on the sweater. Langham's bloodstains were found on Montgomery's clothing, and unidentified bloodstains were found on Fairley's clothing, but no bloodstains were found on Fields's clothing. Also, synthetic fibers from a common source were found on the sweater, Johnson's clothing and Montgomery's clothing. None was found on Fields's clothing.
The evidence for the jury was not limited to the co-indictee Fields. His testimony was corroborated by the bloodstain and fiber tests. Further, the only witness who directly disputed Fields was Fairley, and from this record his testimony is not convincing. Moreover, Fairley admitted telling his sister that Johnson stabbed, and Montgomery shot the officer. Johnson was indicted for capital murder in the death of a patrolman acting in his official capacity, with knowledge he was a police officer acting in his official capacity, in violation of Miss. Code Ann. § 97-3-19(2)(a).
There was a clear jury issue on Johnson's guilt, and we are not at liberty to disturb it.
 II. IMPROPER CLOSING ARGUMENT
Johnson contends there was prosecutorial misconduct in the closing argument. The district attorney made the opening and rebuttal arguments for the state, Johnson's two trial attorneys each made closing arguments in his behalf.
Prior to the circuit judge instructing the jury, defense counsel asked the court to permit them to delay making objections to closing argument until the state had concluded, and make such objections outside the jury's presence, so as not to interrupt the argument. Defense counsel also warned that they might object, in any event, "if something gets out of hand." The record reveals the following (Vol. XII, p. 1984):
 BY MR. HARPER:
 And, Your Honor, one other thing too, rather that — I don't know if we are going to want to make objections during the closing. What I'd like to do is, so that we not interrupt, is to ask to reserve our right to make objections until the closing is completed; and outside the presence of the Jury, make our objections at that time. Of course, if something *Page 208 
gets out of hand, we will have to object at that point.
 BY MR. EVANS:
 That's very considerate of you. Thank you.
 BY THE COURT:
 Okay.
In the state's opening argument, the district attorney made the following statement (Vol. XII, p. 2058):
. . . Samuel Johnson wanted to be the judge and the jury that day. He wanted to return the verdict and then he wanted to return the sentence, but today is a different day. Today is the day I've waited for a long time because besides being an officer, Billy was a friend. Today is the day that Samuel Johnson is going to answer to twelve jurors for his crime. Today is the day and y'all are the twelve.
When defense counsel Harper had concluded his argument, he made the following objection to the opening argument of the district attorney (Vol. XII, p. 2068):
 BY MR. HARPER:
 Your Honor, at this time the Defendant would object to Mr. Evans' statements concerning his personal relationship with the Deceased, stating that he was a personal friend of his. There is nothing of that into evidence at all before this Jury, and we also move for a mistrial on that basis. It improperly prejudices the Jury.
 BY THE COURT:
 Let the record be noted and I will caution Mr. Evans in the future.
 BY MR. HARPER:
 And my motion for a mistrial, then, is overruled?
 BY THE COURT:
 Overruled. Let the Jury come in, please.
No objections to the district attorney's argument were made until he concluded. Among his remarks objected to were the following [his rebuttal concluded (Vol. XII, p. 2125)]:
. . . Like I said a minute ago, I pray to God that he gives you the wisdom to see through this and to see Samuel Johnson for the murderer he is because there ain't nothing else I can do but pray about it now. If he does give you that wisdom and if he gives you that strength of conviction and if he gives you that courage, you're going to find this man guilty of capital murder. Thank you.
The district attorney opened his rebuttal argument with the following comment (Vol. XII, p. 2112):
 I've been a lawyer since 1975, which ain't a long time to a lot of folks, I guess, but since then I've tried an average of one case a week, which makes a little better than three hundred cases. I'm going to tell y'all and everybody here and Mr. Diaz that I have never heard such blatant, arrogant disregard for the truth and patronizing tones that I've just heard from what you call a closing argument, and I'm not going to dignify the majority of it with an answer, . . .
At the conclusion of the district attorney's argument, defense counsel made the following objections, followed by a motion for a mistrial, which was overruled (Vol. XII, p. 2127-2129):
 BY MR. DIAZ:
 Your Honor, we have three objections to Mr. Evans' closing argument, the first being that he made a personal comment, "Pray to God," based on personal belief. It violates, Your Honor, the Fourteenth Amendment and the Eighth Amendment.
 Your Honor, the second reason is personal attacks on myself. He called me a liar. It violates my Eighth Amendment, Fourteenth Amendment, and Mr. Johnson's Sixth Amendment.
 I also object to him making the comment that Mr. Johnson didn't want to go back to jail, and I would like to move for a mistrial.
 BY THE COURT:
 Let the motion for a mistrial be overruled and let the record show that this was at the conclusion of the case, and the attorneys agreed that they would not *Page 209 
make objections during the argument and it kind of binds the hands of the Court.
 BY MR. ROBERTS:
 I want to make a statement into the record too. I think that Mr. Evans' conduct was extremely commendable considering Mr. Diaz's comments from the Bible, which counteracts Mr. Evans', "Pray to God," and also Mr. Diaz' [sic] comments about cheap tricks imposed by the District Attorney. I want that in the record.
 BY THE COURT:
 Of course, the full record is —
 BY MR. ROBERTS:
 Yes, sir.
 BY THE COURT:
 — in the record.
 BY MR. ROBERTS:
 Yes, sir, I just want to make those comments too.
 BY THE COURT:
 Yes, sir.
 BY MR. DIAZ:
 Thank you, Your Honor.
Trial was held from August 30 through September 3, 1982.
On October 11, 1982, Johnson's trial counsel filed a nine-page motion for a new trial, assigning twenty-nine reasons why it should be sustained. The fifteenth assignment reads as follows (Vol. XIII, p. 2308):
 15. The closing argument of the District Attorney in the guilt/innocence phase of Petitioner's trial, was inflammatory, included statements unsupported in the record, and contained a personal attack against Petitioner's trial counsel. The District Attorney accused defense counsel of fabricating evidence on Petitioner's behalf. The argument, in its entirety, was extremely prejudicial to Petitioner and violated his constitutional rights to due process and a fair trial as guaranteed by the laws and Constitution of the State of Mississippi and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
On October 12, 1982, the circuit judge entered an order relieving the trial counsel Gerald Diaz, Jr., and Gregory Harper, and appointing Kenneth J. Rose to represent Johnson on appeal and in future proceedings. This attorney filed a supplemental motion for a new trial on August 29, 1983, assigned seven additional grounds for a new trial, making no mention of the district attorney's argument. Thereafter, on August 31, 1983, counsel filed a second amended motion for a new trial assigning two additional grounds, one of which pertained to the district attorney's argument (Vol. XIV, pp. 2511-2512):
 During the closing argument, the prosecutor connected the evidence of Otis Lee Fairley's prior trial and conviction to Samuel Johnson's case. "This case has been in my office since December the 31st, 1981. I've tried similar cases, two other similar cases, and it's a good thing they didn't ask me what I saw; because I see right now what you do, a murderer. Thats [sic] all. . . . I see a man fighting for his life against the likes of Charles Montgomery and Otis Fairley and Samuel Johnson, convicted murders . . . I've tried two other cases just like this and I've seen what they've tried to do two times before this and I've seen what they've got away with and I see it here and it makes me mad and there ain't nothing I can do about it but pray to God that y'all see through it." (T. Trial at 1622, 1626, 1627). There was no evidence presented of prior murder convictions of Samuel Johnson or Charles Montgomery.
On his appeal, Johnson's counsel has found further statements objectionable.
We must first observe that the state and defense counsel should be given wide latitude in their arguments to a jury. This is inherent in, and indispensable to, our adversary system. Courts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury.
We next observe it is the duty of a trial counsel, if he deems opposing counsel *Page 210 
overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment. See: Wilson v. State,234 So.2d 303 (Miss. 1970) at 308; Aldridge v. State, 180 Miss. 452,177 So. 765 (1938) at 456; Matthews v. State, 148 Miss. 696,114 So. 816 (1927) at 701.
Defense counsel chose not to follow this familiar path, but to wait until the conclusion of the argument to object. This is quite illogical and extreme, and places the state in a "Catch 22" situation. To allow defense counsel to argue at conclusion of argument, to which no objection has been made, he is then entitled to a mistrial is not only inviting error, but also preventing the trial judge from taking the one step he could have taken to remove the possibility of prejudice. We cannot countenance assigned errors based on this sort of a proceeding.
There was not a single statement made by the district attorney, which, even if there were impropriety, could not have been immediately corrected by an objection being sustained, and an admonishment by the court.
Moreover, we have studied the entire argument of the prosecuting attorney. He perhaps made statements he should not have, strong. He was not complimentary of defense counsel. Neither was defense counsel complimentary of the district attorney. It is a common tactic, in one way or another, to diminish your adversary's case by reflections on his attorney. If it becomes too blatant, an objection should be sustained.
The complaint of the prosecution's argument include calling upon the Deity, making reference to the personal friendship of the district attorney and the victim, personal remarks directed to defense counsel, personal belief in Johnson's guilt, and frustration in prosecuting these cases. Every one of these complaints could have been quickly dissipated by a contemporaneous objection and ruling by the circuit judge.
Moreover, no appellate court would be warranted in reversing this case on the basis of the argument made by the district attorney.
 III. REFUSAL OF A CONTINUANCE
Johnson was indicted January 18, 1982. On March 1, 1982, the circuit judge entered an order specially setting the cause for trial July 13, 1982, in the Circuit Court of Covington County. On June 3, 1982, Johnson made a motion for a change of venue. On June 21, 1982, the circuit judge entered an order sustaining the motion, transferring the cause to Pike County, and setting the cause for trial August 30, 1982.
The record in this case reveals thorough and aggressive defense counsel. At least thirty pre-trial motions of one kind or another were made.
Inexplicably, defense counsel waited until August 30, 1982, to file a motion for a continuance on the ground two witnesses purported to be "forensic scientists" would be "out of the country" for the week beginning August 30. The motion further stated these witnesses had viewed all the evidence and prepared extensively from a "scientific point of view," and would be called as witnesses in the defendant's case in chief. Johnson filed no affidavit with the motion. Defense counsel Diaz attached an affidavit to postpone the trial thirty days in order to study the trial transcripts of trials of Montgomery and Fairley, which stated nothing, however, about the absent witnesses.
On August 18 there was a colloquy with the court about these witnesses, the circuit judge stated he had no knowledge as to *Page 211 
what they would testify, and got a general answer they were experts and would help defense counsel try the case.
This motion contained almost none of the essential ingredients we have consistently required under Miss. Code Ann. § 99-15-29
(1972) to justify a continuance of a cause. It was also contemptuous of the obligation every trial counsel owes a court to wait until ten days before the pre-determined trial date to inform the circuit judge of the unavailability of these two witnesses, as shown by the facts in this particular case.
This assignment of error is frivolous.
 IV. LIMITATION OF CROSS EXAMINATION OF FIELDS
Prior to his death, Patrolman Langham had killed a black man. The state made a motion in limine to prevent Fields from testifying to this fact, which the circuit judge sustained. (Vol. V, p. 775)
The mere fact Langham had previously killed a black man in and of itself had no relevancy to this case. In order to make evidence of this fact competent in this case it was incumbent on the defense to in some manner demonstrate its relevancy.
No attempt was made to do so either before or during trial. It was not error, therefore, for the court to sustain the motion.
In Johnson's hearing on his motion for a new trial, conducted September 18, 1983, approximately one year following his trial, the circuit judge was presented with the following affidavit executed by Fairley on September 15, 1983 (Vol. XIV, p. 2520):
 Before me the undersigned authority personally appeared Otis Lee Fairley who after being duly sworn deposes and says:
 My name is Otis Lee Fairley. I grew up in Covington County. Anthony Fields is my first cousin, my father and his mother are brother and sister. Anthony Field's mother has lived for the last several years in Collins, Covington County Mississippi.
 At Samuel Johnson's trial, I was not allowed to testify to a conversation between Anthony Fields and I in the Simpson County Jail in January, 1982, at which time he told me that the Highway Patrolman, Billy Langham, had murdered a black person in Jeff Davis County Ten (10) months before we were stopped. I asked Anthony Fields why he had to kill the Highway Patrolman instead of just coming to the car. He told me that he knew the Highway Patrolman had murdered a black person and that if he let him go he thought the Highway Patrolman would go for his gun and kill us before we could leave.
On appeal Johnson argues he was prevented from introducing thestatement allegedly made by Fields to Fairley as to why he, Fields, shot Langham. No such attempt to introduce such statement was ever made, by asking either Fields or Fairley if it was made. Had defense counsel done so, we would have an entirely different question on competency.
In looking at this record, we could not believe the state would have objected to the admissibility of this statement for either evidentiary or strategic reasons. The concluding sentence of this affidavit as a reason for killing Langham is nonsensical.
It is worth noting that during trial Fairley was given the opportunity on cross-examination to answer why Fields would have shot Langham, but only stated: "He knew all the officers from Covington County." (Vol. XI, p. 1908) There is no merit to this contention.
 V. INSTRUCTION ON CAPITAL MURDER
Johnson argues the court's instruction failed to embrace the statutory requirements of murder and capital murder, and also to require the state to prove intent on his part to commit murder. See: Miss. Code Ann. § 97-3-19(1)(a), and (2)(a). *Page 212 
Instruction C-7 reads in pertinent part (Vol. XII, pp. 1989-1990):
 The defendant, Samuel Johnson, has been charged by an indictment with the crime of capital murder for having wilfully, unlawfully, feloniously, of his malice aforethought and without authority of law kill and murder Billy Morris Langham, a human being, and that the said Billy Morris Langham was a peace officer at the time of the alleged murder, and that at the time of the alleged murder Billy Morris Langham was acting in his official capacity as a peace officer, and that at the time of the alleged murder the defendant, Samuel Johnson, knew that Billy Morris Langham was a peace officer acting in his official capacity.
 If you find from the evidence in this case beyond a reasonabely [sic] doubt that:
 1) The defendant, Samuel Johnson, aided and commanded Charles Montgomery to commit capital murder by stabbing Officer Billy Morris Langham with a knife and ordering Charles Montgomery to shoot Officer Billy Morris Langham; and
 2) That Charles Montgomery wilfully, unlawfully, feloniously and of his malice aforethought and without authority of law kill and murder Billy Morris Langham a human being, by shooting said Billy Morris Langham with a .357 Magnum pistol; and
 3) That Billy Morris Langham was a peace officer, to-wit: a member of the personnel of the Mississippi Highway Patrol; and
 4) That Billy Morris Langham was acting in his official capacity as a peace officer at the time of his death; and
 5) That the defendant, Samuel Johnson, then and there had knowledge and knew that the aforesaid Billy Morris Langham was acting in his official capacity as a peace officer aforesaid; and
 6) That said killing and murder of Billy Morris Langham occurred on the 31st day of December, 1981 in Covington County, Mississippi
 then you should find the defendant, Samuel Johnson, guilty of capital murder, and the form of your verdict may be:
 "We, the jury, find the defendant, Samuel Johnson, guilty of capital murder."
 If you find the State has failed to prove any one of the essential elements of the crime of capital murder, you must find the defendant not guilty of capital murder and you will proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all the elements of the lesser crime of murder less than capital.
It can be readily observed that the first part of C-7 requires intent on the part of Johnson to kill Langham, and knowledge that he was killing a peace officer acting in his official capacity. The following paragraph with its six sub-parts clearly define the acts necessary to come within the capital murder framework. The jury could not have been misled by this instruction. It was never the contention of Johnson, either in the circuit court or on appeal, that the slaying of Langham was not a capital murder. His defense was he had nothing to do with the slaying. We do not have the situation of two parties engaged in a felony, and one without the actual knowledge or consent of the other committing a murder, also. The authorities cited by Johnson are inappropriate.
Moreover, defense counsel approved these instructions by the circuit court. Williams v. State, 445 So.2d 798 (Miss. 1984) at 807; Rayburn v. State, 312 So.2d 454 (Miss. 1975) at 455; Rule 42 Miss. Sup.Ct. Rules.[1] *Page 213 
 VI. EVIDENCE OF PLEA AND SENTENCE OF STATE'S WITNESS
During the state's questioning of Fields, it was brought out that he pleaded guilty and had been sentenced to twenty-five years for his part in this crime. In closing argument the district attorney argued that it was necessary to do this to bring the parties responsible for the officer's death to justice.
The language of this Court in Buckley v. State, 223 So.2d 524
(Miss. 1969), under unusual facts has been the basis for numerous assignments of error. It is time we distinguish Buckley from the usual case.
Let us take the ordinary case in which two or more people are charged with the commission of a crime, and it is necessary that one of the participants in the crime testify for the state in order to make out a case against any of them. Frequently, the state will choose the person whose participation is not as great, or whose guilt is not as reprehensible, or who has readily confessed. Generally speaking, there are good, and at times compelling reasons for the state's choice among those accused to be the witness for the state.
It is not the function of the court, however, to tell the state which witness among the accused persons to select as the witness for the state. It is the right of the state to select which witnesses it deems proper to testify on its behalf.
While it is the sole responsibility of the circuit judge to sentence each accused who has been convicted or pleaded guilty, it is not improper for a circuit judge to take into consideration in his sentencing that such person is cooperating with, and will be a witness for the state in the prosecution of other defendants.
A co-conspirator, co-defendant or co-indictee who has been thus favored, however, is a marked man before the jury. There is a big question mark placed upon his testimony by the law, and indeed the accused on trial is entitled to an instruction that his testimony is to be viewed with caution.
One of the best weapons for defense counsel to further arouse the distrust of the jury in the testimony of such witness is to ask him on cross-examination whether he has been sentenced or not for his participation, and if so, the sentence he has received. Invariably, if he has been sentenced, it will be much lighter than the sentence the man on trial can receive and, if he has not been sentenced, defense counsel can exploit even more the weakness and untrustworthiness of the testimony from such a witness.
These observations are to point out that in the ordinary case, if the state did not on direct have such witness testify as to his plea of guilty and sentence, defense counsel on cross-examination most assuredly would. Indeed, defense counsel would be derelict in his duty to his client not to point this out to the jury, so as to show a very special interest the witness has in his own testimony.
In closing argument, defense counsel has no better weapon to demonstrate the weaknesses of such testimony, the disparity of the sentence received by the state's witness, and the sentence which the court can inflict upon his client. Indeed, even though the state brings out on direct examination the plea of guilty, defense counsel invariably will further exacerbate the state's problem on cross-examination of such witness and hammer away at the disparity in treatment in final argument.
What harm has resulted, then, by the state making this concession in its examination in chief?
In the ordinary case, none.
Buckley presented a special set of facts. Buckley and one Billy Roy Pitts were indicted for kidnapping. At Buckley's first trial, Pitts testified as a witness for Buckley, corroborating Buckley's testimony. *Page 214 
This trial ended in a mistrial when the jury failed to reach a verdict. Prior to the second trial, Pitts pleaded guilty to the charge, and at Buckley's second trial testified as a witness for the state. His testimony in the second trial corroborated the testimony of the kidnap victim, and contradicted Buckley's.
Over the objection of Buckley, the state was permitted to prove Pitts had pleaded guilty and then sentenced to serve five years. We found this to be reversible error there because proof of the plea of guilty over Buckley's objection had the effect of bolstering the testimony of an admitted perjurer. We stated:
 Appellant assigns as error the action of the trial court in overruling his objection to that part of the testimony of Pitts wherein he testified that he had been jointly indicted on the charge of Kidnapping Jack Watkins and that he had plead guilty to that charge, and as a result of his plea of guilty, had been sentenced to serve a term of five years in the state penitentiary. The overruling of this objection and admission of this testimony was reversible error. The law is well settled in this state that where two or more persons are jointly indicted for the same offense but are separately tried, a judgment of conviction against one of them is not competent evidence on the trial of the other because such plea of guilty or conviction is no evidence of the guilt of the party being tried. State v. Thornhill, 251 Miss. 718, 171 So.2d 308 (1965); Pieper v. State, 242 Miss. 49, 134 So.2d 157 (1961); Pickens v. State, 129 Miss. 191, 91 So. 906 (1922). Not only was this testimony designed to lead the jury to believe that since Pitts had plead guilty to the charge, that his co-indictee, Buckley, was also guilty, but it was also designed to bolster the testimony of Pitts. On the first trial of this case Pitts testified and his testimony in that trial corroborated Buckley's version of what happened. On this trial he testified directly contrary on the crucial issues. The state was aware that the evidence that Pitts had plead guilty to the same charge since the former trial would add weight to his testimony. It had the effect of bolstering the testimony of an admitted perjurer. [223 So.2d at 527-528]
The Buckley rationale is not present in this case. Indeed, defense counsel made no objection to the state's elicitation in its direct examination of Fields that he had pleaded guilty and been sentenced for his part in the crime. Defense counsel had excellent reason not to object, this was a fact very much in Johnson's interest with which to acquaint the jury.[2]
We do not overrule Buckley, but neither do we extend its holding beyond the unusual situation of that case. If defense counsel under some unusual case wishes to withhold from the jury the fact that a co-indictee testifying for the state has pleaded guilty and received a lesser sentence, he has a duty to object to the testimony offered by the state. This duty is more compelling in a case of this sort than in the usual case in which we have held that failure to object to testimony waives any assignment of error on appeal.
To permit this defendant to say nothing at trial, and complain for the first time in post-trial proceedings presents a classic case of having your cake and eating it, too.
 VII. REFUSAL OF INSTRUCTION
Johnson complains of the circuit judge's refusal of requested Instruction D-15 (Vol. XII, pp. 2025-2026). This instruction would have authorized the jury to separately consider whether he was guilty or not of the crime of being an accessory after the fact. *Page 215 
No authority is cited in support of this contention, and it is without merit. Johnson was on trial for capital murder, and he was entitled to instructions fully embodying all the elements of this crime, and further that in the absence of proof such elements, he was entitled to an acquittal. He was not entitled, however, to have the jury separately instructed and separately to consider whether or not he was guilty of being an accessory after the fact. See: Wilcher v. State, 455 So.2d 727 (Miss. 1984).
 SENTENCING PHASE VIII. DENIAL OF FUNDS FOR OUT-OF-STATE WITNESSES
The record reveals that on motion by defense counsel, the court awarded expenses to counsel to travel to New York and interview prospective witnesses.
On August 28, 1982, defense counsel filed a motion for compulsory process and attendance fees, as well as travel expenses, for twenty-one prospective witnesses. Attached to the motion is an appendix summarizing the content of their knowledge of Johnson. From the summary of their proposed testimony, it is clear they were character witnesses.
While under the holding of the United States Supreme Court inEddings v. Oklahoma, 455 U.S. 104, 113-115, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982), it might have been proper in the sentencing phase of the trial to have such witnesses testify on Johnson's background, that case is not authority for the proposition that a state is required to furnish travel expenses for out-of-state prospective character witnesses. Moreover, the State of Mississippi is without authority to compel the attendance of out-of-state defense witnesses in a criminal case. See: Diddlemeyer v. State, 234 So.2d 292, 295 (Miss. 1970). Under Article 3, Section 26 of our Constitution an accused is entitled to compulsory process for witnesses in his favor. The state's only power, however, is to reach witnesses within the state.
In any event, before a circuit judge should be critized, defense counsel at a minimum, was under a duty to furnish detailed statements in affidavit form from each of these proposed witnesses as to what their testimony would be in the trial of the case. In this case the only thing presented to the circuit judge was a summary by counsel, not sworn to, as to what these witnesses might testify.
 IX. IMPROPER ARGUMENT IN SENTENCING PHASE
In complaining of improper argument of the district attorney during the sentencing phase, Johnson contends the state led the jury to believe if he were sentenced to life, he would eventually be paroled. Pertinent parts of the argument for the state and defense are as follows:
 CLOSING ARGUMENT
 ON BEHALF OF THE STATE
 BY MR. EVANS:
 Now, what you're considering is serious business. It's about as serious as it gets in our law and in our lives. And a lot of good-hearted and well-meaning people who don't understand the purpose and the necessity of capital punishment will probably say that I'm very cold and harsh and cruel when I stand here and I say that because of having been convicted of second degree assault with intent to commit first degree rape and capital murder that Samuel Johnson should die. . . . [Vol. XIII, p. 2276]
 * * * * * *
 This makes the tenth time that I have either tried or prepared for trial a capital murder case, and if Mr. Johnson's lawyers argue like all those others I've been involved in, they'll ask you for mercy, they'll ask you for compassion; and they'll ask you for compassion, if they're *Page 216 
like the others and tell you that Samuel Johnson doesn't want to die. Billy didn't want to die either. And if they argue like the others, they'll ask you for mercy and plead for Samuel Johnson's life. Billy plead for his life. But mercy wasn't in the heart of Samuel Johnson last New Year's Eve when he told Charles Montgomery twice to shoot. . . . [Vol. XIII, p. 2277]
 CLOSING ARGUMENT
 ON BEHALF OF THE DEFENDANT
 BY MR. HARPER:
 . . . The only thing I'm here to do right now is to ask you to spare his life. And Mr. Evans is right, I am getting up here asking for mercy. I am asking you to spare his life.
 I want you to remember what Dr. Fisher said. And on this Instruction, PS-2, that Mr. Evans has referred to, there are several things that you are to consider as mitigating circumstances. I want you to study this instruction when you get back there and I want you to remember what Dr. Fisher said, that he can function in prison with that life sentence and not be violent. [Vol. XIII, pp. 2279-2280]
 * * * * * *
 I ask you to study the instruction here and remember those things, and I ask you to think about what it's going to be like if he goes to the gas chamber, what it will be like there, and I ask you to spare his life. [Vol. XIII, p. 2281]
 FINAL CLOSING ARGUMENT
 ON BEHALF OF THE STATE
 BY MR. EVANS:
 I can tell you what it's like. It's a gray room all the way around about like this and there's a bench in it and under that bench, there is a pail of water and above that are two pills, and the Sheriff pulls the handle that drops those pills into water. Then Sam Johnson will take a deep breath and in five to ten seconds his life will be ended. There will be no pain, there will be no agony, there will be no suffering. He won't feel a knife in his back and he won't feel a bullet exploding in his brain. And that's what it's like.
 Dr. Fisher said that Samuel Johnson can adapt to prison life. My first response was that we're not here to see how Sam Johnson will adapt to prison life. What concerns me is what is going to happen the next time he decides to commit a second degree assault with intent to rape and what is going to happen the next time he decides he wants a Highway Patrolman or another law enforcement officer dead. You heard Dr. Fisher's testimony that inside prison his potential for violence was low, but outside, it was high. I just can't get concerned about how he would adapt to prison life when I know that his potential for dangerousness on the outside is high. [Vol. XIII, p. 2282]
 * * * * * *
 . . . [W]e have a system that really does work after all. And, as I told you before, I will now, in the name of that system and the decent, law-abiding people in Mississippi, and by the authority that the ones in the Thirteenth District gave me, I'm going to ask that you retire and come back in a little while and tell Judge Pittman by your verdict, yes, we find that the aggravating circumstances do outweigh the mitigating circumstances we find that a man who commits second degree assault with intent to commit first degree rape and a man who has been returned to the penitentiary again and again and again, spent 10 of the last 18 years in the penitentiary, and a man who has a high potential for hurting other people and a man who has taken an innocent life when he killed an officer while that officer was enforcing the laws of our good people, has chosen himself to forfeit his life in the eyes of God and in the eyes of our law. You are not the one executing Samuel Johnson. Regardless of what they tell you, you're not the one. *Page 217 
He chose that himself when he decided to be a criminal in 1963. So, as I said, I now ask you to retire and return shortly and tell Judge Pittman that the aggravating circumstances outweigh the mitigating circumstances and because of that, Samuel Johnson should suffer the penalty of death. [Vol. XIII, p. 2287]
In Hill v. State, 432 So.2d 427, p. 439 (Miss. 1983); and inWiley v. State, 449 So.2d 756, p. 761 (Miss. 1984), we condemned an argument which intimated to the jury that their decision "was not the last word."
In Wiley, we likewise disapproved an argument by the prosecution which stresses that any sentence to life imprisonment inevitably means parole for the convicted person, rather than having to serve his entire life in prison.
It is clear from the argument from the prosecution in this case that the district attorney never reached the type of argument which we condemned in Hill, supra, or in Wiley, supra. The argument made was in answer to the argument of defense counsel, and was fair argument.
In addition to this, defense counsel made no objection whatever to the argument by the state. As we have stated many times, and again in Hill, we are not obligated to review any assignment of error for closing argument in which there was no objection made during the trial.
We have carefully reviewed the entire argument by the state and defense counsel, and we find no reversible error for any statement made by the prosecution.
 X. SENTENCE NOT DISPROPORTIONATE
It is the duty of this Court under Miss. Code Ann. §99-19-105(3)(c) to review the proportionality of every death sentence. We also have this responsibility under decisions of the United States Supreme Court, as well as our own. See: Woodson v.North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Billiot v. State, 454 So.2d 445 (Miss. 1984); Dufourv. State, 453 So.2d 337 (Miss. 1984); and Neal v. State,451 So.2d 743 (Miss. 1984).
Under the facts of this case, the jury was warranted in believing Johnson an active participant, if indeed not the leader, in a deliberate, brutal slaying of a peace officer carrying out his duties. In the absence of the abolition of the death penalty, no appellate court is justified in holding that the jury, having found Johnson guilty, could not also return a death penalty verdict under these facts.
The very word "murder" embraces within its meaning cruelty, brutality and an evil intent carried to the ultimate in harm: death. It is redundant to characterize a murder as cruel, brutal or malicious.
Civilized society must place its dependence on peace officers. They preserve the peace, protect us from harm, and pursue the wrongdoer. They are the front line infantry in society's eternal struggle with crime.
The murder of a police officer in the line of duty must be equated with treason or espionage in time of war. Such a crime warrants the most severe punishment society exacts.[3]
We are not persuaded by Johnson's first argument that his case comes under the proscription of Enmund v. Florida,458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). That case involved a defendant who was a participant in a robbery, but who had nothing whatever to do with the slaying of the robbery victims.
Nor, is there any merit to Johnson's second argument that because Fairley and Montgomery in separate capital murder trials received verdicts of life imprisonment from the juries, Johnson could only be sentenced to life. See: Bullock v. State,391 So.2d 601, pp. 612-614 (Miss. 1980). *Page 218 
 XI. PRECLUSION OF EVIDENCE OF SENTENCES OF CO-DEFENDANTS
Somewhat more troublesome is Johnson's argument that the circuit judge erred in excluding from consideration by the jury during the sentencing phase that the juries trying Fairley and Montgomery had rendered life sentence verdicts. Clearly, underEddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), Johnson was entitled to have his trial jury consider "any relevant mitigating circumstance."
Were the life sentences of Fairley and Montgomery relevantmitigating circumstances?
We must hold they were not. Suppose, for example, the juries which tried Fairley and Montgomery had returned death penalty verdicts? Would the state, under any theory, have been permitted to show this over Johnson's objection? Each case tried by a separate jury must stand on its own. Otherwise, the jury trial is pointless.
Moreover, for the separate sentences of Fairley and Montgomery to have had any meaning in Johnson's, it would have been necessary to develop all the facts of each of their trials for this jury.
Johnson cites two Florida cases, both of which are distinguishable. In Messer v. State, 330 So.2d 137 (Fla. 1976), the Florida Supreme Court held the trial court erred in excluding from consideration by the jury during sentencing phase the plea bargained second degree murder sentence received by a co-defendant. As we stated, supra, Johnson in this case was clearly entitled to have the jury know and consider the guilty plea and sentence of Fields. This is quite different from the convictions of Fairley and Montgomery.
Slater v. State, 316 So.2d 539 (Fla. 1975), involved a circuit judge overruling a jury recommendation of life imprisonment and imposing the death sentence, a procedure authorized under the Florida statutes. The Florida Supreme Court in turn overruled the circuit judge's imposition of the death sentence, the main reason being that an equally culpable defendant had been authorized to plead nolo contendere to first degree murder and received a life sentence.
Thus, it is clear the Florida cases have no application to this case.
 XII. SENTENCING INSTRUCTION PS-2
Johnson's first complaint on this instruction is that it did not provide a "principled basis for distinguishing this case from the many other murder cases in which the death penalty was not imposed under the statute." His supporting argument is somewhat amorphous, nebulous, which we would be inclined to ignore in a less somber case. As we construe it, he argues that including as an aggravating circumstance his 1963 conviction of assault to commit rape did not channel the sentencing jury's discretion by "clear and objective standards."
We note that Miss. Code Ann. § 99-19-101(5)(b) authorizes the sentencing jury to consider as an aggravating circumstance, "the defendant was previously convicted . . . of a felony involving the use or threat of violence to the person." Contrary to Johnson's assertion, this is a clear and objective standard, fulfilling the guidelines of the United States Supreme Court inZant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and as further stated by California v. Ramos,463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); and Gregg v.Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
It is not the purpose of Federal appellate review to deny to the states the authority to and responsibility for determining the aggravating circumstances which justify a death penalty.Gregg v. *Page 219 Georgia, supra; Zant v. Stephens, supra; California v.Ramos, supra; and Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).
Nor is it the function of this Court to curtail this authority vested in our legislature. We cannot say the legislature had no constitutional authority to include this as an aggravating circumstance in a death penalty case.
Johnson further claims, without citing authority, that the conviction was too remote in time to be considered as an aggravating circumstance. Again, we are not prepared to deny the legislature had the power and lawful authority to include this aggravating circumstance in the instruction on the facts in this case. We note the circuit judge wisely and humanely permitted Johnson to include in the instruction as a mitigatingcircumstance the remoteness in time of this conviction. Johnson was thus permitted to argue to the jury the point he asserts here, and in this argument he had the approval of the court's own instruction. Cf. Zant v. Stephens, supra; Godfrey v. Georgia,446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
Nor do we find merit in Johnson's next contention that the record does not support a consideration by the jury as an aggravating circumstance that Johnson committed the murder for the purpose of avoiding arrest.
Finally, he argues the record does not support a jury consideration whether the murder was especially heinous, atrocious and cruel. But, see: Booker v. State, 449 So.2d 209
at 220-221 (Miss. 1984); Caldwell v. State, 443 So.2d 806
(Miss. 1983) at 814-815; and Irving v. State, 441 So.2d 846
(Miss. 1983) at 849-850.
 JOHNSON'S SUPPLEMENTAL BRIEF
Johnson filed a supplemental brief containing seven additional assignments of error.
 XIII. WAS THERE A DISCOVERY VIOLATION?
Simpson County Jail inmate Norman Shelly was called by the state as a rebuttal witness at the guilt phase of appellant's trial. [Vol. XI, pp. 1928-1930] Shelly testified he overheard a conversation between Johnson and cellmate and co-indictee Otis Lee Fairley in which, without objection by defense counsel, the following transpired at trial:
 Q. Tell me what you heard Mr. Johnson and Mr. Fairley say. Without telling anybody else.
 A. I overheard them talking about how one took the knife off the top of the car.
 Q. Which one was that?
 A. And gave it to the other one. Otis took the knife off the top of the car and gave it to Sam.
 Q. What did Sam say, if anything, if you remember?
 A. I don't know. I can't remember where — he just stated that was the fact, the way he took the knife and used the knife.
 Q. Is that the gist of the conversation as best you can remember it?
 A. Yes, sir.
 [Vol. XI, p. 1930] [Emphasis added]
There was no objection and the defense cross-examined Norman Shelly. In this appeal the appellant pleads complete surprise and that he had no opportunity to interview the witness concerning this statement.
Defense made two motions before trial which in this assignment of error he asserts have been violated. The first was a motion for disclosure of witnesses, all evidence favorable to accused and discovery and inspection [Supplemental Abstract, pp. 389-390; Vol. II, pp. 207-210], which was granted. [Supplemental Abstract, p. 391; Vol. V, p. 706] The second was a motion to supress written or oral statements made to Johnson by any investigating officer [Supplemental Abstract, pp. 392-393; Vol. II, pp. 224-226], which was granted as confessed *Page 220 
by the D.A. Tolbert v. State, 441 So.2d 1374, 1375 (Miss. 1983).
Johnson claims in this assignment the admission of the above conversation into evidence was reversible error because the prosecutor deliberately violated a court suppression order. He complains the suppression order directed that "no statement of the defendant regarding the facts can be used against him at the trial of this cause."
Contrary to what Johnson now asserts, the above conversation was not embraced in any discovery motion or discovery order.
Johnson's brief contains the following astonishing statements: "Shelly's testimony came as a complete surprise to the Appellant. Defense Counsel had no opportunity to interview the witness concerning the statements attributed to the Appellant." [sic] [Supplemental Brief, p. 1]
If this were the case, why did defense counsel make no objection? Further, the admission of this testimony was not assigned as error in the detailed motions for new trial. On appeal, Johnson has changed counsel. Johnson and his counsel go outside the record in claiming Shelly's testimony came as a complete surprise. No such claim appears in the record.
To permit a defendant and his counsel in any case, including a death penalty case, to sit idly by and make no objection to questionable testimony, exacerbate the matter still further by ignoring the testimony in the motion for new trial, and argue for the first time on appeal the admission of such testimony, would countenance the laying of a trap in every case. This is especially true where, as in this case, there has been a change in defense counsel.
In the first place, from this record we do not know if Johnson's counsel was unaware of this proferred testimony prior to trial. In the second place, it is clear from this record Johnson was ably represented by thorough defense counsel, and there may have been a very good reason why no objection was made.
The facts of this case are clearly distinguishable fromTolbert v. State, 441 So.2d 1374 (Miss. 1983), and there is no merit in this assignment.
 XIV. VIOLATION OF RULE IN PERMITTING THE SHERIFF TO TESTIFY
In rebuttal Sheriff Lloyd Jones testified. Johnson complains that Sheriff Jones should not have been permitted to testify in rebuttal to deny he had a conversation with a defense witness Carl Lee. The reason is that Jones was not excluded from the courtroom when the rule was invoked. Permitting an officer of the court to remain in the courtroom is discretionary with the trial court. See: Bell v. State, 443 So.2d 16 (Miss. 1984).
 XV. WAS DEFENDANT BROUGHT IN THE PRESENCE OF THE JURY IN HANDCUFFS?
Johnson goes outside the record and claims that he was brought into the courtroom in the presence of the jury in handcuffs. The record does not support this claim. Indeed, the record indicates that the court saw to it that this would not occur. [Vol. VIII, p. 1250]
 XVI.
ADMISSION OF CHECKS FOUND IN AUTOMOBILE, WHICH CONTAINED FINGERPRINTS OF JOHNSON AND LANGHAM
The trial court permitted the introduction into evidence of checks found in the automobile, after ruling that they could only be referred to as "documents." [Vol. IX, pp. 1506-1511] These documents were not circulated to the jury but the fingerprint expert referred to them in his identification as having the fingerprints of Johnson. *Page 221 
 XVII. FAILURE TO PROVIDE JOHNSON WITH COUNSEL AT THE ARRAIGNMENT HEARING
Johnson complains, without citation of authority, the state failed to provide him with counsel at the "initial appearance hearing." He states this violated his constitutional rights. The record does not support this contention. [Vol. IV, p. 605, et seq.]
 XVIII.
EXCLUSION OF JURORS WHO HAD CONSCIENTIOUS SCRUPLES AGAINST INFLICTION OF DEATH PENALTY
Johnson argues that it was error to exclude in the guilt phase of his trial jurors who clearly had fixed conscientious scruples against infliction of the death penalty. There was no error in excluding such jurors. See: Wilcher v. State, 448 So.2d 927
(Miss. 1984); Sonnier v. Maggio, 720 F.2d 401 (5th Cir. 1983);Smith v. Balkcom, 660 F.2d 573 (5th Cir. 1981); Spinkellink v.Wainwright, 578 F.2d 582 (5th Cir. 1978); and Woodard v.Hutchins, 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984).
 XIX.
THE ADMINISTRATION OF THE DEATH PENALTY IN THIS STATE IS ARBITRARY AND DISCRIMINATORY IN VIOLATION OF THE APPELLANT'S EIGHTH AND FOURTH AMENDMENT RIGHTS
Johnson claims that he was denied a request to present evidence on the death penalty being administered in an arbitrary and discriminatory manner. The record reveals Johnson made a motion to strike and quash as unconstitutional the death penalty statute (Vol. II, pp. 239-243) and the hearing his counsel requested on the motion was held by the court. (Vol. IV, pp. 605-700).
Nothing offered by Johnson supports his contention that the death penalty is being administered unfairly because of either his or the victim's race.
 PART B.
ROY NOBLE LEE, Presiding Justice, for the Court:
THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ON THEIR OPTION TO RECOMMEND A LIFE SENTENCE EVEN IF AGGRAVATING CIRCUMSTANCES WERE FOUND TO OUTWEIGH MITIGATION.
The requested instruction, which was refused by the court, follows:
 The court instructs the jury that if you see fit, whether mitigating circumstances exist or not, you may recomment [sic] mercy for the defendant. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.
The appellant contends that refusal of the instruction constituted reversible error. However, the question has been resolved against the position of appellant in three (3) felony murder cases wherein the death penalty was imposed, viz, Bullockv. State, 391 So.2d 601 (Miss. 1981); Jordan v. State,365 So.2d 1198 (Miss. 1978); and Hill v. State, 432 So.2d 427
(Miss. 1983). In Hill v. State, a similar instruction to that refused here was under consideration. The Court said:
 Argument of appellant is that reversible error was made by the trial court when it failed to grant the following sentencing information requested by the defense:
 Instruction D-2:
 Ladies and gentlemen of the jury, I charge you that you need not find any mitigating circumstance in order to return a sentence of life imprisonment. A life sentence may be returned regardless of the evidence.
 The appellant contends that this refusal had the effect of denying the jury the right to sentence him according to their feelings of mercy. He maintains that the jury was left with the impression *Page 222 
that they were bound to return a verdict that the appellant should suffer the death penalty if they found that aggravating circumstances outweighed the mitigating circumstances from the evidence presented. According to him, this would be tantamount to a mandatory application of the death penalty and contrary to the mandate of individualized consideration handed down by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
 We do not agree that the jury in the case in question was under any impression that they had no choice but to impose the death penalty. Their verdict was as follows:
 We, the Jury, unanimously find that the aggravating circumstances . . . outweigh the mitigating circumstances and are sufficient to impose the death penalty, and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances. . . .
432 So.2d at 441.
The jury verdict in the case sub judice was almost verbatim to the verdict in Jordan and the same reasoning that applied there must prevail here.
Juries may pardon an accused by a not guilty verdict, when his guilt is overwhelming from the record; they may exercise clemency toward one found guilty, where the statute permits juries to fix the punishment, and the verdicts will be upheld. However, trial judges are required to instruct juries, according to the law.
The judgment of the lower court is affirmed and Wednesday, the 19th day of June, 1985, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AS TO GUILT PHASE; AFFIRMED AS TO SENTENCING PHASE.
PATTERSON, C.J., WALKER, and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur as to Part A.
HAWKINS, J., dissents as to Part B.
 APPENDIX "A"
DEATH PENALTY CASES AFFIRMED BY THIS COURT:
Cabello v. State, 471 So.2d 332 (Miss. 1985)
Billiot v. State, 454 So.2d 445 (Miss. 1984)
Dufour v. State, 453 So.2d 337 (Miss. 1984)
Stringer v. State, 454 So.2d 468 (Miss. 1984)
Wilcher v. State, 455 So.2d 727 (Miss. 1984)
Wilcher v. State, 448 So.2d 927 (Miss. 1984)
Neal v. State, 451 So.2d 743 (Miss. 1984)
Booker v. State, 449 So.2d 209 (Miss. 1984)
Caldwell v. State, 443 So.2d 806 (Miss. 1983)
Irving v. State, 441 So.2d 846 (Miss. 1983)
Tokman v. State, 435 So.2d 664 (Miss. 1983)
Leatherwood v. State, 435 So.2d 645 (Miss. 1983)
Hill v. State, 432 So.2d 427 (Miss. 1983)
Pruett v. State, 431 So.2d 1101 (Miss. 1983)
Gilliard v. State, 428 So.2d 576 (Miss. 1983)
Evans v. State, 422 So.2d 737 (Miss. 1982)
King v. State, 421 So.2d 1009 (Miss. 1982)
Wheat v. State, 420 So.2d 229 (Miss. 1982)
Smith v. State, 419 So.2d 563 (Miss. 1982)
Edwards v. State, 413 So.2d 1007 (Miss. 1982)
Johnson v. State, 416 So.2d 383 (Miss. 1982)
Bullock v. State, 391 So.2d 601 (Miss. 1980)
Reddix v. State, 381 So.2d 999 (Miss. 1980)
Jones v. State, 381 So.2d 983 (Miss. 1980)
Culberson v. State, 379 So.2d 499 (Miss. 1979)
Gray v. State, 375 So.2d 994 (Miss. 1979) *Page 223 
Jordan v. State, 365 So.2d 1198 (Miss. 1978)
Voyles v. State, 362 So.2d 1236 (Miss. 1978)
Irving v. State, 361 So.2d 1360 (Miss. 1978)
Washington v. State, 361 So.2d 61 (Miss. 1978)
Bell v. State, 360 So.2d 1206 (Miss. 1978)
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FORRESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983)
Dycus v. State, 440 So.2d 246 (Miss. 1983)
Coleman v. State, 378 So.2d 640 (Miss. 1979)
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR ANEW TRIAL ON SENTENCING PHASE ONLY:
Mhoon v. State, 464 So.2d 77 (Miss. 1985)
Cannaday v. State, 455 So.2d 713 (Miss. 1984)
Wiley v. State, 449 So.2d 756 (Miss. 1984)
Williams v. State, 445 So.2d 798 (Miss. 1984)
[1] The state's only answer to this assignment of error in its brief was that it was waived. We have also addressed the assignment on its merits.
While the state is correct the point was waived, we think a word of caution is in order. When the state fails to answer an assignment of error on the merits, and rests its case with the contention the point has been waived, it places itself in some jeopardy. We do not know whether in so doing the state is conceding that if the point in fact was not waived, it is meritorious.
[2] It is interesting that in this case one of the pre-trial motions was to require the state to disclose any agreement it had made with any prosecuting witness that would influence his testimony, because such agreement would affect the credibility of the witness, and the "trial jury is entitled to know it." [Vol. II, p. 262]
[3] It follows this case is not disproportionate to the sentences imposed in other capital murder cases. See "Appendix A" for cases considered by this Court in this case.