515 So.2d 877 (1987)
Danny Clay RATLIFF
v.
STATE of Mississippi
No. 57257.
Supreme Court of Mississippi.
November 4, 1987.
*878 Roger F. Wicker, Sparks, Wicker & Colburn, Tupelo, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
On December 11, 1983, Thomas Mallory was dumped out in the middle of the road, a bullet in his head, his truck fleeing the scene, his personal belongings missing, but yet alive. Danny Clay Ratliff was subsequently arrested, indicted and convicted of armed robbery, following which he was sentenced to thirty-three years imprisonment.
Ratliff now appeals. The evidence against him, though circumstantial, is quite convincing. We find no error and affirm, though adding ex cathedra an admonition regarding the sheriff's failure to summon fully the jurors listed on the special venire.

II.
At some time after 8:00 p.m. on December 11, 1983, Clarence Hardy and his wife were driving down Southern Heights Road in Lee County, Mississippi, when they met a vehicle which had its bright lights on. As they approached, the truck driver's door was opening and Clarence Hardy saw the image of a person struggling inside. The truck itself was rolling to a stop. Hardy and his wife passed the truck but, deciding to investigate further, turned around only to discover the truck gone and the figure of Thomas Mallory sprawled across the road whereupon they called for help.
Five witnesses placed Danny Clay Ratliff with Mallory earlier that day; all five had been hanging out at the Haven Acres Grocery Store close to Verona in Lee County. Joan Lauderdale, her sister Jacqueline Smith, Sabrina Edwards, Doris Simms, and Walter Calvin Hereford told similar tales. They had been at the grocery between 7:30 and 8:00 p.m. when a "white guy" had driven up in a truck. Lauderdale remembers Ratliff being in the truck with a guy when it drove up. Hereford and Simms, though, state that the white man was alone when he drove up the first time. As Hereford tells it, he and Denice Owens walked up to the truck when the man called them over.
Danny Ratliff also went to the truck. The white man wanted to know where he could find a black woman. When Hereford said he didn't know of any available, the man asked about getting some liquor. The four drove off to the bootlegger's where the white man paid for some whiskey. They were gone about ten minutes and pulled back up at the store. Hereford testified he thought he might have heard Ratliff say the white man had some money, but he wasn't sure. At any rate, Hereford and Denice left for the skating rink leaving the rest of the story to be told by those inside the Haven Acres Grocery.
Sabrina Edwards had been dating Danny Ratliff occasionally; she had known him for three to four weeks. The morning of the 11th, Ratliff had needed a ride home to Ecru. A friend of Sabrina's brother said he would take him for $10.00. Sabrina borrowed $10.00 from her mother since Ratliff had no money. However, when Sabrina saw Ratliff later at the grocery store, he told her he had gambled and lost the $10.00. Sabrina Edwards did not see the white guy drive up to the store, but she did see Joan, Ratliff and Hereford at the truck. The man had been looking for a girl. She saw Hereford and Ratliff leave with the man but, as opposed to Hereford's ten minutes, thought they were gone about an hour. Sabrina may have missed their earlier arrival at the store because she stated *879 that when the truck came back she didn't see Calvin or the white guy, only Ratliff who came in the store acting rather nervously. He bought some things at the store. Ratliff pulled some money out of his pocket, but Sabrina couldn't tell how much it was. He wanted to give her a ride home to talk to her. "He told me he had done something, that he had shot somebody." About thirty minutes after Sabrina arrived home, Ratliff was at the door. She wouldn't let him in, but he stuck his foot in the door and told her "he had done something and wanted to get away, but he wanted to talk to me before he left." He offered her some money pulling a wad of it out of his pocket. "It looked like a lot."
Joan Lauderdale, Jacqueline Smith, and Doris Simms added that after the white man drove up the first time, Ratliff came in and told them he was looking for a woman and for them to go with him but not to worry because he was going to "clip the man." As Lauderdale explains, she took that to mean he was going to take the guy's money  "rip him off." Strikingly, all three testified to those words "clip the man" or "clip the white man." All were able to identify the truck the white man drove from pictures of it. Doris Simms also testified that Ratliff later drove up in the truck alone and bought something at the grocery.
James Earl Kirkwood set out the final scene in this circumstantial drama. He was working at a service station in Memphis in the early morning hours of December 12, 1983. A man driving a truck came in and wanted to buy beer but settled for some cigarettes and potato chips when he found out it was too late (or early) to purchase alcohol. He pumped some gas and paid for it with a credit card signing "Tom Mallory" to the charge slip. Kirkwood testified that Ratliff was the man who signed the card.
There was another man accompanying Ratliff. Ratliff told Kirkwood that the man was a hitchhiker. Kirkwood described with great particularity the clothing Ratliff had on that night down to the "Pierre Cardin" western-style boots but failed to mention a rather prominent two and a half to three inch scar on Ratliff's forehead. Kirkwood testified that the man was at the station for almost an hour since the pumps were slow. The charge slip was admitted into evidence. Kirkwood identified the truck from photos shown him of Mallory's truck and the man who was in it as Ratliff.
The truck was found at the Belden, Mississippi, post office December 13, 1983, abandoned. The Lee County Sheriff's Department had it dusted for fingerprints. Five prints were found to be those of Danny Ratliff. These were found on the inside of the driver's side window; outside on the passenger side; outside, passenger side, under the window; outside on the driver's side; and on the outside of the passenger door.
Ratliff presented no evidence on his behalf. The jury found him guilty of armed robbery but was unable to fix the sentence. On June 21, 1985, the Circuit Court sentenced Ratliff to thirty-three years imprisonment. See Miss. Code Ann. § 97-3-79 (Supp. 1986). From this conviction, Ratliff appeals.

III.

I. Did The Lower Court Err In Overruling the Defendant's Objection To The Special Venire In That Approximately Fifty Percent Of Said Venire Was Shown To Be "Not Found?" Did The Court Further Err In Refusing To Allow The Defendant To Call The Lee County Sheriff As A Witness To Inquire As To His Department's Procedures In Serving The Members Of The Venire?

Prior to commencing with voir dire, Ratliff moved for a continuance. It appears that counsel for defense and state had agreed to use the special venire of a hundred persons drawn for another case. However, of the one hundred, fifty-two were "not found" and fourteen were excused for other reasons. Ratliff attempted to call the Sheriff of Lee County to discover with what diligence his department *880 had served those on the special venire. The State responded by stating that the thirty-two who appeared on the special venire and the thirty-nine jurors on the regular panel should be sufficient. Based on this, the judge denied the motion.
If there were not some seventy to eighty jurors available for the trial of this case and we were running short or whatever, I would feel that that [examining the Sheriff's Department] might be an appropriate matter to deal with, but we've got eighty jurors who have not tried a case, who have done nothing.
In Robinson v. State, 418 So.2d 794, 796 (1982), forty additional jurors were summoned per motion of the defense. Defendant moved to quash the special venire, however, on the grounds that only twenty-three of the forty appeared and five of those were excused by the judge. This Court, citing Smith v. State, 242 Miss. 728, 733, 137 So.2d 172, 173 (1962), found no prejudice to the defendant and thusly, no merit to the assignment. In Smith, the trial court had summoned a special venire of forty jurors; only eighteen appeared. After excusals and challenges, six remained. That court looked to Walford v. State, 106 Miss. 19, 27, 63 So. 316, 317 (1913) which stated:
The Sheriff failed to summon forty jurors, and therefore to that extent failed to obey the order of the court; but under Section 2718 this provision of the jury law is directory merely. Since there is no hint in the record that an impartial jury was not obtained, appellant suffered no harm by reason of the fact that the Sheriff summoned thirty men, and cannot complain thereof.
See also Buchanan v. State, 84 Miss. 332, 36 So. 388 (1904).
In the case at bar, Ratliff argues that the failure of two-thirds of the special venire to show defeats the purpose behind the calling of a special venire "which is to give the defendant in a case such as this a sufficient number of extra jurors from which to draw." On other days this argument may prevail. Here, however, Ratliff challenged none of the jurors for cause.
Ratliff argues that the "defendant should have been allowed to question the process servers as to any potential discrimination with regard to race or ethnic composition in serving veniremen." Yet, if the resulting venire represented only one race or socio-economic class, lending truth to the allegation of fraudulent procedures on the part of the Sheriff's Department, the record should so reflect. If Ratliff had pointed out below that the members of the special venire were all Japanese, or all came from the same neighborhood or whatever, and the judge overruled his motion, this assignment might have merit, but that is not the case here.
If there was fraud or misconduct in the procedures used by the Sheriff, it was Ratliff's duty to investigate and call this to the court's attention. By calling the Sheriff as a witness, however, Ratliff was on a fishing expedition which the court had every prerogative to deny. "The trial judge has discretion in the conduct of a trial and has a duty to see that the court's time is used economically. Turner v. State, 220 So.2d 295, 297 (Miss.), cert. denied 396 U.S. 834, 90 S.Ct. 92, 24 L.Ed.2d 85 (1969).... Since there is no showing of prejudice to the appellant, there is no showing of abuse of the trial court's discretion in the matter."
We add a word. The procedure for a special venire is available to persons accused of certain serious crimes as a matter of right. See Miss. Code Ann. §§ 13-5-77 and 99-15-27 (Supp. 1987). Such persons are entitled to have the sheriff proceed in good faith and with due diligence to the end that all persons listed upon the special venire in fact be served and summoned for jury duty. It is not within the sheriff's authority, after a certain number of persons have been served, to decide unilaterally that there will be enough jurors at trial and make no further effort to summon the unserved jurors. To be sure, as a practical matter, there will always be some prospective jurors who may not be found, still, the sheriff should do his best.

*881 IV. Did The Lower Court Err In Allowing The District Attorney To Argue That The

Defendant Deserved The Death Penalty?
During closing argument, the prosecuting attorney described the terrible injury suffered by Thomas Mallory and stated:
"I submit to you that this was an evil crime, to shoot a man in the head. I will submit that this is the type of crime to which you should sentence this man to death." Ratliff promptly objected, only to be overruled by the Circuit Court.
Ratliff argues that this comment about sentencing him to death "was designed to improperly inflame and arouse the passions of the jury" and was clearly error. In reply, we are told the prosecutor was merely expressing his belief that "this was a serious crime deserving of the harshest possible penalty." The jury was properly instructed on the verdicts it could return and the death penalty was not one of them.
In Johnson v. State, 477 So.2d 196, 209 (Miss. 1985), this Court commented:
... . The State and defense counsel should be given wide latitude in their arguments to a jury. This is inherent in, and indispensable to, our adversary system. Courts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury.
The prosecutor's argument in Johnson contained inferences to the diety, remarks about the personal friendship between the district attorney and the victim, comments to defense counsel, expression of personal belief in the defendant's guilt, as well as statements of frustration in prosecuting these cases. In affirming the conviction the Johnson Court stated, "No appellate court would be warranted in reversing this case on the basis of the argument made by the district attorney." Johnson, 477 So.2d at 210. See also Gray v. State, 351 So.2d 1342, 1346-47 (Miss. 1977).
While the prosecutor's comment in the instant case may have been inflammatory in that it was designed to arouse the passions and prejudices of a jury, it was legally harmless in light of the fact that the jury was not able to agree on the punishment (not that it was given the choice of death). The Circuit Court imposed the thirty-three year sentence, not the jury. Besides, the comment is not so outrageous, considering that, had the victim died (a bullet to the brain can be fatal), the death penalty could have been sought. In other words, with no greater criminality on his part, Ratliff could have been exposed to the death penalty.
The assignment of error is denied.

V. Was The Verdict Of The Jury Contrary To The Overwhelming Weight Of The Evidence?

Ratliff argues that the case against him is a weak, circumstantial one.
The most significant witness against Mr. Ratliff was his former girlfriend, Sabrina Lynn Edwards. Examination of Ms. Edwards' testimony reveals that her relationship with Mr. Ratliff had ended and that she was hostile and bitter toward him. Further, Ms. Edwards was forced to admit that she had called Mr. Ratliff's defense attorney on the evening of June 17, 1985, and had lied to the attorney about several matters, which contradicted her testimony at trial.
Also, Ratliff takes issue with the testimony of James Kirkwood, the gas station attendant. Kirkwood's failure to mention the prominent scar on Ratliff's forehead and the fact that Kirkwood had allegedly seen Ratliff for only a brief time a year and a half ago weakens Kirkwood's testimony. Also, the fingerprints prove nothing since Ratliff and Mallory "were unquestionably together earlier that evening."
True, the case against Ratliff is circumstantial. But Ratliff was seen with Mallory in Mallory's truck just before Mallory was injured and Ratliff was seen alone in Mallory's truck just afterward. Edwards testified that Ratliff told her he had shot someone and that she had seen Ratliff alone in Mallory's truck. The gas station attendant had 45 minutes to an hour to observe Ratliff and made a positive identification. His failure to remember the scar on Ratliff's forehead was something upon *882 which the jury had an opportunity to deliberate as were the details of Edwards' conversation with Ratliff's lawyer.
The State cites Whittington v. State, 377 So.2d 927, 929 (Miss. 1979) (conflicts in the evidence are for the jury to resolve); Robinson v. State, 418 So.2d 749, 751 (Miss. 1982) (the jury may accept or reject any part of the testimony of any witness); Murphree v. State, 228 So.2d 599, 601 (Miss. 1969), cert. denied 397 U.S. 1068, 90 S.Ct. 1509, 25 L.Ed.2d 690 (1970) (the jury may draw any reasonable inferences from the evidence); Tolbert v. State, 407 So.2d 815, 820 (Miss. 1981) (the sufficiency of circumstantial evidence is peculiarly for the jury to determine, and their decision should not be disturbed unless it is opposed by a decided preponderance of the verdict). Here "the only reasonable inference to be drawn from the evidence is that Ratliff was the armed robber," argues the State. "There was here no cause for disturbing the jury's verdict." Fisher v. State, 481 So.2d 203, 214 (Miss. 1985).
Unfortunately for Ratliff, the evidence, circumstantial though it may be, adds to a pretty clear picture of what happened that evening. Ratliff had been with Mallory in Mallory's truck. Five people so testified. Three testified that he had come into the store and said he was "going to clip the white man." Three stated they had seen Ratliff come back to the store alone in Mallory's truck. One identified Ratliff as the man who drove Mallory's truck into a service station in Memphis some four to five hours after the incident and used Tom Mallory's credit card to buy gas and food. From this evidence, the jury found Ratliff guilty. The evidence outlined above is more than sufficient to support that verdict. See McFee v. State, 511 So.2d 130, 134 (Miss. 1987); Toncrey v. State, 465 So.2d 1070, 1072 (Miss. 1985); Blanks v. State, 451 So.2d 775, 779 (Miss. 1984); Winters v. State, 449 So.2d 766, 771 (Miss. 1984); see also Fisher v. State, 481 So.2d 203, 213-14 (Miss. 1985).
CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-THREE YEARS IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.