811 So.2d 272 (2001)
Ronald Earl ALEXANDER, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00487-COA.
Court of Appeals of Mississippi.
January 9, 2001.
*274 William C. Trotter, III, Kellie Williamson Koenig, Greenville, MS, Attorneys for Appellant.
Office of the Attorney General, by Scott Stuart, Attorney for Appellee.
Before McMILLIN, C.J., BRIDGES, and MYERS, JJ.
BRIDGES, J., for the Court:
¶ 1. Ronald Earl Alexander was indicted by a grand jury in Sunflower County, Mississippi on two counts of sexual battery, one count of attempted sexual battery and one count of attempted capital rape, all committed on a six year old girl, who, because she is a minor child, will hereinafter be referred to as "S.A." Following the indictment, a trial by jury was held in the Circuit Court of Sunflower County, Honorable W. Ashley Hines presiding. On February 9, 1999, the jury returned a verdict of guilty on all four counts. Alexander was subsequently sentenced to twenty years on Count I of sexual battery; twenty years on Count II of sexual battery, to be served concurrently with the sentence on Count I; ten years on Count III of attempted sexual battery, to run consecutively with the sentence on Count I; ten years on Count IV of attempted capital rape, to run consecutively with the sentences on Counts I and III; and court costs.
¶ 2. At the conclusion of the State's case-in-chief, Alexander made a motion for a directed verdict stating that the State had not put on enough evidence to achieve a conviction. This motion was denied by Judge Hines. Following the trial, Alexander filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, motion for a new trial. This motion was denied by Judge Hines as well. Alexander then filed a timely notice of appeal containing three issues for our review:
I. Whether the trial court erred in denying Alexander's motions for directed verdict, JNOV and new trial and refusing to overturn the jury verdict of guilty because such verdict was contrary to the law and against the overwhelming weight of the evidence?
II. Whether the trial court erred in denying Alexander's request that the State charge and try Alexander on only one charge pursuant to the "same transaction rule?"
III. Whether the trial court erred in denying Alexander's motion for a mistrial because evidence of other crimes was presented in front of the jury after a motion in limine was granted to disallow such evidence?

FACTS
¶ 3. The events leading to this matter took place on or about September 13, 1996, when Alexander was babysitting the victim, S.A., and her younger brother while their mother and a friend were apparently out for the evening. Alexander was the boyfriend of S.A.'s mother at the time of this incident. Seven weeks later, on November 2, 1996, S.A. told her grandmother, Evelyn, that she wanted to come live with her and then she told her grandmother the events that took place on what was determined *275 to have been September 13, 1996, the night Alexander babysat S.A. and her brother.
¶ 4. S.A. told Evelyn that Alexander had "messed" with her. More specifically, in her own terms, S.A. revealed that Alexander had "tried to stick his thing in her behind" and that he "stuck his thing in her" and "squirted white stuff all over her stomach." S.A. went on to say that Alexander made her put her mouth on his "thing" and then he did the same to her. According to S.A.'s account of the events, Alexander attempted to penetrate S.A.'s anus and vagina and then forced her to perform oral sex on him, where he thereafter ejaculated on her before performing oral sex on her. S.A. also revealed that Alexander placed his tongue around and inside her anus before preparing to attempt anal intercourse with her.
¶ 5. Immediately after hearing S.A.'s description of these happenings, Evelyn took S.A. to the family doctor, Dr. Edgar Donahoe, where S.A. again recounted these same events, after which he attempted to perform a short examination of S.A. Evelyn then took S.A. to the Indianola Police Department to file a complaint against Alexander, where S.A. once more repeated the details of this incident to Detective Brad McCoy.
¶ 6. Evelyn, Dr. Donahoe and Detective McCoy all appeared as witnesses at Alexander's trial. Also appearing as witnesses were Glyn Criswall-Kern, a child therapist specializing in child abuse who began meeting with S.A. regarding this incident in March 1997; Vickie Brocato, a child therapist specializing in child sexual abuse who began treating S.A. in June 1997; Gail Barnett, a family nurse practitioner with Charter Behavioral Systems who had a chance to observe and examine S.A. in September 1997; and Jennifer Pearce, a friend of S.A.'s mother who saw S.A. the morning after these events were determined to have occurred. Kern, Brocato and Barnett were all tendered by the State as expert witnesses in the field of child therapy. In order to prevent further trauma for S.A., the State filed a motion to make S.A. unavailable as a witness for Alexander's trial. The motion was granted by Judge Hines. Because S.A. would not be taking the witness stand on her own behalf in the trial, a hearing was held where the court ruled that it would allow the hearsay evidence of each of these witnesses who testified as to things that S.A. said and did regarding the incident on September 13, 1996. At Alexander's trial, each of these witnesses, for both the State and Alexander, duplicated the testimony they gave at the hearing.
¶ 7. Evelyn and Detective McCoy both testified about S.A.'s account of the events that took place between her and Alexander on September 13, 1996. Evelyn further testified that S.A. told her that she did not tell anyone about the sexual abuse at first because Alexander threatened the lives of her, her mother and her brother if she told. Evelyn also testified that S.A. began living with her from the time she told Evelyn of the incident until the present. There is no indication S.A.'s mother objected in any way to Evelyn's caring for S.A., taking S.A. to be examined after her discovery of these events or taking physical custody of S.A. Dr. Donahoe testified that his examination of S.A. on November 4, 1996, revealed nothing unusual about S.A.'s vagina and he stated that her hymen appeared to be intact. However, Dr. Donahoe also admitted at trial that he did not do a thorough exam on S.A. because she was highly agitated, and therefore he could say nothing to a medical certainty. On the other hand, Barnett testified that in her examination of S.A.'s female organs, she found that S.A. had "no hymenal tissue *276 whatsoever" and that "her vaginal opening was gaping." Kern and Brocato both testified that S.A. exhibited signs of a child who is disturbed by a trauma such as sexual abuse. Pearce, Alexander's witness, testified that she observed S.A. the morning after the alleged incident and thought that S.A. seemed "normal" and was outside playing as if nothing was bothering her.
¶ 8. Police testimony revealed that when Alexander was questioned by the police regarding the events of which S.A. had accused him, he replied that he was not sure if he had done those things or not, but he did not think that he did. Alexander denied that he ever made this or any statement to the police and he claimed that the officers gave him a blank sheet of paper to sign and later "made up" a statement and inserted it in between the initials of Alexander which he had written on the "blank" piece of paper. However, Alexander's first initial appears at the beginning of the first word of the statement and his last initial appears right next to the last word of the statement, indicating that the statement was typed and present on the piece of paper that Alexander was given just before he signed his initials on it.
¶ 9. Alexander adamantly denies that he ever touched S.A., even though his statement revealed that he did not really remember the events of that night. He also claims that all of the testimony given by the medical experts called as State's witnesses should not have been allowed because Evelyn did not have legal custody of S.A. at the time that she took S.A. to each of the doctors and therapists for examination, and therefore she could not have had authority to waive S.A.'s medical privileges on her behalf. Alexander claims that only S.A.'s mother had the authority to consent to S.A.'s medical care; therefore, the testimony by the State's experts should be stricken as improper. Alexander did admit that he was babysitting S.A. on the night of September 13, 1996. Alexander, however, could not explain to S.A.'s mother, upon her return home at 2:30 a.m., why S.A. was in bed with him and why she was not wearing any panties. Alexander claims that he had a few drinks that night and that he must have passed out. He asserted that he did not know how S.A. ended up asleep in bed with him or where her panties were.
¶ 10. Alexander is asking this Court to reverse and render this case on the grounds that the State did not meet its burden in presenting evidence against him that would cause a jury to convict him beyond a reasonable doubt. In the alternative, he requests that if this Court chooses not to reverse and render his case, then we should reverse and remand for a new trial, ordering the trial court to reduce his charges to only one offense. He claims that he should not have received a sentence on all four counts for which he was indicted because they all arose out of the same transaction and each count amounts to exactly the same offense. Thus, he prays that this Court will allow him a new trial where he will only be charged with one offense and where he could only be sentenced for that one offense. Further, Alexander cites error that testimony by Brocato about other instances of sexual abuse on S.A. by Alexander was allowed to be heard by the jury in violation of a court order that all testimony be confined to the specific events of September 13, 1996. He urges, among all of his other assertions, that because of this violation, a mistrial should have been granted and the trial judge was in error for not doing so.
¶ 11. For the reasoning given in our legal analysis below, we find that Alexander's claims have no merit and hold that *277 the jury verdict stands and Alexander's sentence is affirmed.

STANDARD OF REVIEW
¶ 12. Our standard of review regarding a motion for new trial is stated in McClain v. State:
The challenge to the weight of the evidence via motion for a new trial implicates the trial court's sound discretion. Procedurally such challenge necessarily invokes Miss. Unif.Crim.R. of Cir. Ct. Prac. 5.16. New trial decisions rest in the sound discretion of the trial court, and the motion should not be granted except to prevent an unconscionable injustice. We reverse only for abuse of discretion, and on review we accept as true all evidence favorable to the State.
McClain v. State, 625 So.2d 774, 778 (Miss. 1993). See also Collier v. State, 711 So.2d 458, 461 (Miss.1998); Herring v. State, 691 So.2d 948, 957 (Miss.1997). The same standard is used to review overruled motions for a directed verdict and overruled motions for JNOV. See McClain, 625 So.2d at 778; Wetz v. State, 503 So.2d, 803, 808 (Miss.1987). Motions for directed verdicts and motions for JNOV are both for the purpose of challenging the legal sufficiency of the evidence. Noe v. State, 616 So.2d 298, 302 (Miss.1993); McClain, 625 So.2d at 778. See also, Strong v. State, 600 So.2d 199, 201 (Miss.1992). Our standard of review regarding the legal sufficiency of the evidence is as follows:
[W]e must, with respect to each element of the offense, consider all of the evidence not just the evidence which supports the case for the prosecutionin the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Wetz, 503 So.2d at 808.
¶ 13. "The jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." Billiot v. State, 454 So.2d 445, 463 (Miss.1984). This Court may not make an assessment on the credibility of the trial witnesses as this task is one for the jury presiding over the matter. Kinzey v. State, 498 So.2d 814, 818 (Miss. 1986). When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact. This Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible. The law provides:
Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude *278 which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.
Groseclose v. State, 440 So.2d 297, 300 (Miss.1983).
¶ 14. On the issue of the standard of review for convictions based primarily on circumstantial evidence, this Court must not disturb the conviction unless the appellant convinces us that the evidence was opposed by a preponderance of evidence on his part. Brown v. State, 556 So.2d 338, 340 (Miss.1990). Furthermore, in Collier v. State, the Mississippi Supreme Court held that "the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence...." Collier v. State, 711 So.2d 458, 462 (Miss.1998).

LEGAL ANALYSIS

I. Whether the trial court erred in denying Alexander's motions for directed verdict, JNOV and new trial and refusing to overturn the jury verdict of guilty because such verdict was contrary to the law and against the overwhelming weight of the evidence?
¶ 15. In a case of a conviction based on mostly circumstantial evidence, a reviewing court may not disturb the conviction "unless it is opposed by a decided preponderance of the evidence." Brown, 556 So.2d at 340. However, Alexander has given virtually no evidence, much less a preponderance of such, that the jury's verdict was improperly reached. According to the above standard of review, this Court must look at the evidence in the light most favorable to the verdict. Wetz, 503 So.2d at 808. Alexander has given this Court nothing that would be sufficient to overturn the jury's verdict, and we do not have the responsibility of reweighing the evidence to determine which witnesses we believe had the most credibility. Groseclose, 440 So.2d at 300.
¶ 16. In Collier, the Mississippi Supreme Court provided:
[T]he unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence, especially if the conduct of the victim is consistent with the conduct of one who has been victimized by a sex crime.
Collier, 711 So.2d at 462. Here, while S.A. did not testify in court, the lower court accepted all of the testimony of her grandmother, police officers and child therapists and doctors as exceptions to the hearsay rule because S.A. was declared unavailable for trial. According to all of that testimony, S.A. reported everything that happened to her at the hands of Alexander, and he has shown this Court nothing to discredit S.A.'s recall of the events of that night.
¶ 17. Furthermore, the doctors and therapists provided testimony which produced evidence that S.A.'s physical and mental state were, at the time of their observation of S.A., consistent with a child who has been sexually victimized. There is no evidence presented by Alexander which would tend to contradict this testimony other than Dr. Donahoe's testimony that he found no evidence of physical trauma to S.A.'s female organs. However, Dr. Donahoe's conclusions were found to be flawed when he admitted that he did not get an accurate or thorough examination of S.A. and that he could say nothing about her physical state to a medical certainty. He did, nevertheless, testify that her mental state was agitated, restless and she *279 appeared emotionally disturbed at being subjected to his examination of her private parts.
¶ 18. Alexander presents no evidence that would be beneficial to his claim that he did not do these things to S.A., nor does he show this Court any indication that S.A. would have a reason to fabricate these allegations against him. Alexander complains that S.A.'s description of the events of September 13, 1996, was given in childlike terms, making it difficult to understand exactly what she was talking about. However, we are not convinced that these unsophisticated idioms used by S.A. baffled the astute and cultured adults to whom she said them. The terms "wing-wang," "thing," "white stuff," and the like are not beyond the understanding of grown-ups. Furthermore, there is evidence presented that S.A. also drew pictures of the events in her therapy sessions, which almost certainly left little room for doubt in the minds of her therapists as to which parts of Alexander's body she was referring.
¶ 19. Further evidence established that S.A. no longer had a hymen and that, upon thorough examination, her private areas showed definite signs of sexual battery. These therapists also reported that S.A.'s mental state was not in much better condition, citing that she was irritable and volatile when asked to talk about the events of that night and that she showed irrefutable psychological signs of a child who had been sexually abused. Moreover, we note that S.A.'s story never changed throughout all of her recitations of the incident. It remained the same no matter who she told or how many times she told it. It is common knowledge that many times, when a child is lying about events that occur, his story will be different each time because he cannot always remember what story he told the first time or, in some cases, what they were coached to tell the first time. We do not believe that this is one of those cases. S.A. never added to or omitted anything from the original story that she told her grandmother, and she has never faltered all through this entire ordeal.
¶ 20. In light of the standard of review, we find that there is absolutely no strength to Alexander's argument that the jury's verdict was against the overwhelming weight of the evidence. It is clear from the record and from the statements made by Alexander that there were ample grounds on which the jury could have convicted him for each count on which he was indicted. The only witnesses to testify on behalf of Alexander were himself and Pearce. Pearce, however, made it clear that she did not spend much time with S.A. and, as such, her testimony that S.A. appeared normal and playful the day after these alleged sex crimes occurred would be shaky at best. Pearce admitted that she was not close to the little girl and was not terribly familiar with her mannerisms, which would lead to the logical conclusion that S.A. would not likely disclose to someone who is virtually a stranger, such as Pearce, the things that happened to her. Furthermore, we cannot disregard the testimony of Evelyn who told the court that S.A. did not tell anyone for seven weeks after the incident because she was in fear that Alexander would do something to hurt her, her mother or her brother. We find that the pieces of this puzzle fit together just short of perfectly when we take into account the evidence that S.A.'s mother walked into her home to find S.A. in the same bed with Alexander with her underwear nowhere in sight. To add to the evidence against Alexander, when he gave his statement to the police, he did not deny what had happened, but rather, as told by the officer who took his statement, "didn't remember doing that" and "didn't think he did." We do not dismiss the fact that *280 Alexander only retracted these statements or claimed that he never made them after he had retained counsel who likely explained to him all of the consequences those statements could have. Only after realizing how serious these accusations were did Alexander begin to rigidly deny the allegations against him.
¶ 21. Because this Court is charged with accepting all of the State's evidence as true, including reasonable inferences of truth, we are bound to find that the verdict against Alexander was not against the overwhelming weight of the evidence brought forth at trial. Therefore, we find that Alexander's motions for directed verdict, JNOV and a new trial were properly denied by the trial judge.
¶ 22. As to the sub-issue of whether Evelyn had the authority to waive S.A.'s medical privilege on her behalf, we also find no merit to Alexander's claim that all of the expert testimony put on by the State should be disregarded because Evelyn had no right to consent to S.A.'s medical treatment. The State offers that S.A.'s mother was "absent" in accordance with the statute when the decision was made to take S.A. to see a doctor. Miss. Code Ann. § 41-41-3(k) (Supp.2000). We are convinced by the State's argument. There is no evidence brought forth by Alexander regarding the whereabouts of S.A.'s mother following these events. We are given no indication as to what role S.A.'s mother played in any of this ordeal. We are convinced that, as this was a decision that had to be made urgently, Evelyn was justified in immediately taking S.A. to be treated and examined. Furthermore, according to case law, Evelyn had every right to do so in the absence of any action by S.A.'s mother. Jenkins v. State, 146 Miss. 339, 340, 111 So. 433, 433-34 (1927). As well, we find that the State is correct in its argument that Alexander has no rights under the law to bring forth S.A.'s medical privileges in his defense. This is a claim that only S.A. or her guardian may make. Cotton v. State, 675 So.2d 308, 312 (Miss. 1996); Jenkins, 111 So. at 433-34.

II. Whether the trial court erred in denying Alexander's request that the State charge and try Alexander on only one charge pursuant to the "same transaction rule?"
¶ 23. We find that there is no merit to Alexander's argument on this issue. As was pointed out by the State, even though all of these events took place on the same night and at virtually the same time, it does not necessarily lead to the conclusion that all of these crimes should be wrapped neatly into one little package. We find that the two separate counts of sexual battery are proper as Alexander violated S.A. by penetrating two separate orifices of her body, namely, her vagina and her anus, with his tongue. Furthermore, he attempted to penetrate her anus with his penis unsuccessfully, giving rise to the attempted sexual battery charge. As to the charge of attempted capital rape, we find that this was proper as well because Alexander attempted to penetrate S.A.'s vagina with his penis unsuccessfully. All of these crimes are very separate and very distinct in alignment with the law. The fact that he committed them all in one night, in a small time frame, does not constitute a triggering of the same transaction rule. The law specifically provides that the same transaction rule applies when one act is "necessarily incident to the other," not where the same transaction "gives rise to separate and distinct offenses" as we have here. Laughter v. State, 241 So.2d 641, 643 (Miss.1970). In Maycock v. Reed, 328 So.2d 349, 352 (Miss.1976), the court found that where four indictments for separate crimes grew out of the same facts and circumstances, *281 "[a]t the most, all that the proof in the record shows on this issue is that there were four separate transactions on the same occasion, which of course, does not come within the one transaction rule announced in Laughter v. State."
¶ 24. Further, in U.S. v. Swaim, the United States Supreme Court ruled that "[t]he test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not." U.S. v. Swaim, 757 F.2d 1530, 1536 (1985). None of the acts that Alexander performed on S.A. were necessarily incident to the other. In other words, because he did one of these despicable acts to S.A. did not require that he do the remaining acts. As the State put it, it was not necessary for Alexander to attempt to have carnal knowledge with S.A. in order to commit fellatio or attempted anal sex. None of these crimes was a prerequisite to the others. Sexual battery is defined by statute as a person engaging in sexual penetration with "(a) another person without his or her consent; (b) a physically helpless person; (c) a child under the age of fourteen years." Miss.Code Ann. § 97-3-5 (Rev.1999). Sexual penetration is defined as "any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body." Miss.Code Ann. § 97-3-97(a) (Rev.1999). What we have here is two different occasions of Alexander inserting an object or body part (his tongue) into both the genital opening and anal opening of S.A.'s body. That makes two counts of sexual battery as defined by the statute. Additionally, Alexander's attempt to penetrate S.A.'s anal opening with his penis would constitute an attempt to commit a third count of sexual battery. That's not to even mention the fact that Alexander violated S.A.'s mouth with his penis as well.
¶ 25. The statute on capital rape includes the following requirement: a person of the age of eighteen years or older carnally and unlawfully knowing a child who is under the age of fourteen. Miss.Code Ann. § 97-3-65(1) (Rev.1999). As pointed out by the State, the legal definition of "carnal knowledge" includes "the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." BLACK'S LAW DICTIONARY 213-14 (6th ed.1990). Alexander's attempt to penetrate S.A.'s vagina would be attempted capital rape. These acts are all plainly separate violations of S.A.'s body and require proof of separate facts. As such, we find that it was proper that Alexander was indicted and tried according to each separate count for which he was convicted. The same transaction rule, in our opinion, does not apply here, and Alexander's forty year sentence should therefore be affirmed.

III. Whether the trial court erred in denying Alexander's motion for a mistrial because evidence of other crimes was presented in front of the jury after a motion in limine was granted to disallow such evidence?
¶ 26. Again, we find that this issue is without merit. It is the opinion of this Court that the testimony given by Brocato at trial regarding the fact that S.A. had accused Alexander of sexual violations on other occasions should not have constituted grounds for a mistrial. In the first place, we note that Alexander's defense attorney was the party who was responsible for eliciting the response from *282 Brocato that is in question, therefore placing no responsibility for Brocato's reply on the prosecution. In Simpson v. State, 366 So.2d 1085, 1086 (Miss.1979), the court provided that "a defendant cannot complain of the evidence which he himself brings out." (citing Stone v. State, 210 Miss. 218, 49 So.2d 263 (1950)). Further, in Singleton v. State, 518 So.2d 653, 655 (Miss.1988), the court ruled that "[a] defendant cannot complain on appeal of alleged errors invited or induced by himself." (citing Davis v. State, 472 So.2d 428 (Miss.1985); Browning v. State, 450 So.2d 789 (Miss.1984); Jones v. State, 381 So.2d 983 (Miss.1980)). The court went on in Singleton to provide, "[w]e think an appellant cannot assail as prejudicial his own trial tactics, because it would fasten a propensity in litigants to create error to enhance the possibility of reversal and repeated trials. This he is not permitted to do." Singleton, 518 So.2d at 655.
¶ 27. "It is an old principle that an attorney who invites error cannot complain of it, and this principle negates any merit that the appellant's contention may have had." Edwards v. State, 441 So.2d 84, 90 (Miss.1983). In our opinion, Alexander's attorney asked a question of Brocato that required her to answer the way that she did. The record reflects that defense counsel approached Brocato about incidents regarding the sexual abuse of S.A. by Alexander at a person named "Dorothy's" house. Brocato indicated that these incidents recorded in her notes, to which defense counsel was referring, were separate from the one at issue on September 13, 1996. Brocato, in our opinion, could not have answered this question in any other fashion but to inform defense counsel that the incidents about which she was being interrogated were separate from the incident being argued at trial. Now, however, Alexander is asking this Court to overturn the trial judge's refusal to grant a mistrial on the grounds that Brocato brought up other instances of Alexander's sexual abuse of S.A. in violation of the court order requiring testimony to be confined to September 13, 1996. The case law we have cited and referred to above explicitly defines the solution to this argument: because Alexander's counsel opened the door to this conversation by specifically asking Brocato about the incidents at Dorothy's house, it was to his own peril. He may not now complain that the information was brought out in front of the jury when it was his own question that brought it there. Simpson, 366 So.2d at 1086.
¶ 28. It is our opinion that Brocato's testimony did not work to prejudice the jury in any way. The trial judge recognized that Brocato's response was not evil-minded or a purposeful violation of a court order, but rather was a simple answer to defense counsel's question. The judge did not feel that it was an intentional violation that would warrant a mistrial. As the court provides in Horne v. State, 487 So.2d 213, 215 (Miss.1986), "the circuit judge is in the best position to weigh the consequences of the objectionable argument and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment." (citing Johnson v. State, 477 So.2d 196, 210 (Miss.1985)). It is our opinion that the trial judge in this case did weigh the consequences of Brocato's statement and decided that her comment in response to defense counsel's question did not constitute irreparable damage in prejudicing Alexander. Before the judge had a chance to admonish the jury to disregard Brocato's statement, defense counsel moved for a mistrial, after which a bench conference ensued and subsequently was continued in the judge's chambers. The judge informed defense counsel that he *283 would gladly instruct the jury to disregard Brocato's answer, but that he was not granting a mistrial. The record of this conference between the judge and the attorneys reveals that defense counsel told the judge that he did not wish for the jury to be instructed to disregard Brocato's testimony because he felt it would call more attention to the mistake than necessary and, in turn, hurt his case more than it would help. The judge gave defense counsel the choice of whether the jury would be admonished and defense counsel rejected that offer. Therefore, we are of the opinion that Alexander may not now complain that the jury was not instructed to disregard Brocato's statement when his own counsel made the choice not to do so. This Court cannot overturn the judge's decision to deny the motion for mistrial because that choice was in the judge's sound discretion and we are of the opinion that he did not abuse that discretion. Horne, 487 So.2d at 215.
¶ 29. We note that in Baine v. State, 604 So.2d 249, 256 (Miss.1992), the Mississippi Supreme Court held that admonishing the jury to disregard improper statements given by a witness is sufficient to negate any prejudice that might be suffered by the appellant. However, in this case, defense counsel requested that this not be done and indicated, on the record, that for the judge to do so could prejudice his client even more. As such, we find that Alexander cannot now cite reversible error here. The jury drew its own inferences from the evidence presented by both sides and there is no indication or proof cited in the record that the jury would have acquitted Alexander had Brocato not made the statement at issue.
¶ 30. We find that all of Alexander's points of error show no merit and, as such, his convictions on two counts of sexual battery, one count of attempted sexual battery and one count of attempted capital rape should stand. Further, the sentences for each of Alexander's crimes should be upheld.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF SUNFLOWER COUNTY OF CONVICTION OF COUNT I SEXUAL BATTERY AND SENTENCE OF TWENTY YEARS; COUNT II SEXUAL BATTERY AND SENTENCE OF TWENTY YEARS TO RUN CONCURRENTLY WITH SENTENCE IN COUNT I; COUNT III ATTEMPTED SEXUAL BATTERY AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY WITH SENTENCE IN COUNT I; COUNT IV ATTEMPTED CAPITAL RAPE AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY WITH SENTENCES IN COUNTS I AND III, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO SUNFLOWER COUNTY.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., IRVING, LEE, MYERS, PAYNE, and THOMAS, JJ., concur. CHANDLER, J., not participating.